Richard L. CHANDLER, Appellant,

v.

Rachel CHANDLER, William R. Copeland, and Weldon S. Copeland, Jr., Appellees.

No. 08–97–00484–CV.

Court of Appeals of Texas, El Paso.

April 15, 1999.

Rehearing Overruled June 9, 1999.

William R. Copeland, El Paso, for Appellees.

Richard L. Chandler, Lubbock, for Appellant.

Before Panel No. 2 BARAJAS, C.J., McCLURE, and CHEW, JJ.

## *O P I N I O N*

ANN CRAWFORD McCLURE, Justice.

Richard Chandler ("Richard"), appeals from a summary judgment in favor of Rachel Chandler, William R. Copeland, and Weldon S. Copeland, Jr., Appellees, and a permanent injunction and permanent order to cease and desist. Finding no error, we affirm.

### FACTUAL SUMMARY

The litigation between Richard and Rachel Chandler spans some nineteen years and, at a minimum, some ten lawsuits in both state and federal courts scattered from El Paso to Lubbock to Austin. The driving issue, from Richard's perspective, is whether Rachel is entitled to an interest in his military retirement benefits. The underlying issue for our consideration is whether the Chandler marriage was valid or void. Because of the multiplicity of lawsuits and their resulting entanglement, we first provide a detailed chronology of events.

### *The Chandler Marriage and Divorce*

On June 29, 1942, Rachel married Pablo Torres Tovar in Mexico. While she claimed to have divorced him, there is no recorded divorce decree on file in Mexico. Rachel and Richard married on October 17, 1949, in Juarez, Mexico. On May 28, 1980, a final decree of divorce, entered in Cause No. 77–1540, dissolved the marriage. Pursuant to the decree, Rachel was awarded the following:

The Court having found that [Richard] is retired from the United States Army and is currently receiving United States Army retirement pay on a monthly basis, and that such retirement pay constitutes vested contingent community property, [Rachel] is therefore awarded the sum of FOUR HUNDRED FIFTY DOLLARS ($450.00) per month from [Richard]'s monthly retirement pay if, as and when such benefits are paid to [Richard] and [Richard] shall hereafter remit to [Rachel] the sum of FOUR HUNDRED FIFTY DOLLARS ($450.00) from such retirement benefits, and [Richard] is hereby constituted a trustee for the purpose of receiving said sum of money hereinabove awarded to [Rachel] and [Richard] shall immediately upon receipt thereof, and not more than five (5) days after such receipt, remit said sum to [Rachel].

### *The Bill of Review*

In June of 1981, Richard learned that Rachel may not have been divorced from Pablo Torres Tovar. As a result, he ceased paying any portion of the retirement benefits to Rachel as required under the decree. In August 1983, Rachel, through her attorneys, successfully applied to the United States Army Finance and Accounting Center (USAFAC) for direct payment of the benefits awarded to her. When the Army refused Richard's request that the direct payment be discontinued, Richard filed a bill of review, which although originally and mistakenly docketed under the divorce Cause No. 77–1540, was subsequently redocketed as Cause No. 87–5225. Specifically, Richard alleged:

[Richard] was prevented from asserting his right to a greater share of the parties' estate than that awarded to him pursuant to the above-described agreement and judgment by [Rachel]'s fraud in securing the agreement and [Richard]'s consent to entry of the judgment. Specifically, [Rachel], knowing that her representations and statements were false and with the intent to defraud [Richard], continually, through the en-

tire duration of the purported marriage to [Richard], represented to [Richard] that she had been married (prior to the purported marriage to [Richard]), but had, in fact, received a divorce from her prior husband. In reliance on these representations, [Richard] entered into the purported marriage with [Rachel]. Contrary to [Rachel]'s representations, [Rachel] was previously married to another individual in Zacatecas, Mexico, which marriage was never dissolved by divorce, annulment, or death of either parties [sic]. As a result, the purported marriage between [Richard] and [Rachel] is void and of no effect.

He then sought the following relief:

[Richard] requests that the Court set aside and cancel the settlement agreement signed by [Richard] and [Rachel] for the reasons set forth above; that the Court set aside the judgment rendered on May 28, 1980, which incorporated the terms of the property settlement agreement; and that the Court order a division of the estate of the parties in a manner that the Court deems just and right.

Despite his specific allegation that the marriage was void, Richard did not seek a declaratory judgment that the marriage was void. The only relief he requested was that the property settlement agreement be set aside and the property redivided. This omission will become significant, as we will detail.

On October 5, 1983, USAFAC sent a letter to Rachel advising her that because of the pending bill of review action, all monies owed to her under the decree would be escrowed until the litigation was concluded. For reasons unexplained in the record, the bill of review sat on the docket for some six and a half years. On April 6, 1990, the court entered an "Order Granting Partial Motion for Summary Judgment [sic]." This order provided:

After viewing the evidence and upon conclusion of the arguments of counsel, the Court finds that the Petitioner,

RICHARD L. CHANDLER, has established a prima facia case of a meritorious defense to the cause of action alleged to support the Judgment.

IT IS, THEREFORE, ORDERED that Petitioner's Partial Motion for Summary Judgment is granted as to the issue of a prima facia meritorious defense.

The court finds that the Petitioner is entitled to a trial on the merits of those issues in his Original Petition for Bill of Review and the Answer thereto filed by the Respondent, as those pleadings may be amended prior to trial.

The case proceeded to a jury trial on March 18, 1991. The charge inquired:

Do you find that prior to the marriage of Richard L. Chandler in question in this case, Rachel Chandler knowingly made false representations as to material facts to Richard Chandler with the intent to induce him to enter into that marriage and that Richard Chandler suffered a pecuniary loss as a proximate cause of his reliance on the representations?

You are instructed that when answering this question you are to limit your considerations to Rachel Chandler's representation, if any, that she had been divorced from Pablo Torres Tovar.

The jury answered "No." The court entered a take-nothing judgment on Richard's bill of review action. Richard appealed the judgment, and this court affirmed. *Chandler v. Chandler*, 842 S.W.2d 829 (Tex.App.—El Paso 1992, writ denied). The mandate issued September 10, 1993.

### The Litigation Explosion

Undeterred, Richard attacked on multiple fronts. Armed with the partial summary judgment we have already referenced, he visited with the legal assistance office of Reece Air Force Base. On December 14, 1993, a legal assistance attorney wrote to USAFAC advising them that

Mr. Chandler was granted a Motion for Summary Judgment in which the court

found as fact that Rachel Chandler entered in marriage with Richard Chandler without divorcing her first husband. Under Texas law, a marriage is void if either party was previously married and the prior marriage is not dissolved. Vernon's Texas Codes Annotated, Family Code Section 2.22, *Acuna v. Sullivan,* 765 F.Supp. 510 (1991). Property acquired during a putative marriage in Texas is *not* community property. *Chapman v. Chapman,* 11 Tex.Civ.App. 392, 32 S.W. 564. Therefore there is no basis upon which to make a community property division. It should be further noted that in the original divorce decree served on the Army that a specific finding of marriage is not made. Thus, the Army has no factual basis upon which to invoke the Former Spouses Protection Act and make any direct payments to the former Rachel Chandler.

Thereafter, in September of 1994, Richard, by this time a resident of Lubbock, filed suit against Rachel in Lubbock County seeking a declaratory judgment that the marriage and divorce decree were void. The suit asserts "that the order granting partial summary judgment fully adjudicated the suit to declare the parties' marriage void and the legal effect of such judgment is to render [Rachel] either a meretricious or putative former spouse neither of which status [sic] would have interest in the community property named in the decree of divorce." The trial court granted Rachel's motion to transfer venue and the case was filed under Cause Number 96–4533 in the 205th District Court of El Paso County.

On November 16, 1994, Richard filed suit in Cause No. 87–5225 in the 41st District Court of El Paso County seeking a declaratory judgment that the divorce decree and take-nothing judgment in the bill of review litigation were void.[1] The same day, in Cause No. 77–1540 in the 41st District Court, he filed a motion for clarifying order, seeking an order requiring Rachel to revoke her application for direct payment of the military retirement benefits.[2] These pleadings give rise to the judgment from which Richard appeals. However, because a permanent injunction is at issue, we pause to note the filing of still other lawsuits.

In 1995, Richard filed suit against Rachel and USAFAC in Austin, Travis County, Texas. This suit was ultimately transferred back to El Paso County on a change of venue and was docketed as Cause No. 95–12922 in County Court at Law Number Four. It likewise sought a declaratory judgment as to the validity of the marriage, the rights of the parties under the property settlement agreement and under the Uniformed Services Former Spouses' Protection Act (USFSPA).[3] At the Army's request, the suit was removed to federal court. A United States District Judge for the Western District of Texas dismissed the suit and enjoined Richard from filing any lawsuits against Rachel based on "anything arising from or coming from or associated with the divorce case, Cause Number 77–1540."

Also in 1995, in a wholly separate proceeding, Richard filed suit in Cause No. 95–921 in the 205th Judicial Court in El

1. On May 17, 1989, apparently during the bill of review proceeding, the judge of the 41st District Court entered a protective order requiring Richard to obtain leave of court prior to filing any grievance against Rachel's attorneys with the State Bar of Texas. The November 16 motion also sought leave to file grievances against William R. Copeland and Weldon S. Copeland, Jr.

2. As we have noted, the original divorce action between the Chandlers bore Cause No. 77–1540. The bill of review action was ultimately docketed as Cause No. 87–5225. The

suit seeking to declare void both the divorce decree and the bill of review judgment was filed under the bill of review cause number. The motion for clarifying order, attempting to clarify the original decree, was filed under the divorce cause number. Thereafter, some pleadings were filed under the divorce cause number, others were filed under the bill of review cause number, and many were filed under both.

3. 10 U.S.C. § 1408 (1998).

Paso County, seeking a declaration that the marriage and divorce decree are void. Notwithstanding all of these lawsuits, Richard admittedly filed four or five other federal lawsuits against the United States government contending that his marriage to Rachel was void. Rachel was not named as a party to the latter suits. While he denied filing suit to compel a governmental official to deport Rachel from the United States, he admitted that · he had filed a motion explaining "all the failures of her truthful affidavit, etc. as far as her prior marriage, not having children, profession that she was in and they said they couldn't—that I couldn't— . . . I couldn't—I was not a proper party to make that motion. And they denied the motion and that was the end of it." He also complained that federal officials were not "doing what they were supposed to do in examining the naturalization papers of people coming into this county [sic]."

Still further, while the record is not clear as to the dates of the order, a Lubbock County judge enjoined Richard from filing any further "frivolous lawsuits" against Rachel and sanctioned him $5,000, which he has not paid.

### Procedural History of This Litigation

As we have already noted, on November 16, 1994, Richard filed suit in Cause No. 87–5225 in the 41st District Court of El ·Paso County seeking a declaratory judgment that the divorce decree and take-nothing judgment in the bill of review litigation were void. The same day, in Cause No. 77–1540 in the 41st District Court, he filed a motion for clarifying order, seeking an order requiring Rachel to revoke her application for direct payment of the military retirement benefits. On January 11, 1995, Richard filed a motion for summary judgment in Cause No. 87–5225 relating to the declaratory judgment.[4]

On January 17, Judge Mary Anne Bramblett, presiding judge of the 41st District Court, requested the appointment of Judge Herb Marsh to preside in Cause No. 77–1540 due to her crowded docket. The next day, Judge William E. Moody, presiding judge of the Sixth Administrative Judicial Region, appointed Judge Marsh to hear the case. Appearing *pro se,* Richard wrote a letter to Judge Moody, dated February 7, 1995, regarding the appointment of Judge Marsh. Uncertain as to whether the letter constituted an objection, Judge Marsh telephoned Richard. Ultimately, on April 6, 1995, Judge Marsh presided over a hearing on motions for temporary and permanent injunctions and on Richard's motion for summary judgment. Rachel and her attorneys filed their motion for summary judgment on April 11, and a second hearing related to the summary judgment motions was conducted on June 23. On June 29, Richard filed a motion to recuse Judge Marsh, which was duly referred to Judge Guadalupe Rivera of the 168th District Court on August 10. A recusal hearing was conducted on September 13, 1995. The order denying the motion to recuse was signed October 9, 1995. On November 17, 1995, Richard filed a motion to challenge the visiting judge, and on November 30, he filed yet another objection to Judge Marsh.

In March 1996, Richard filed an application for temporary and permanent injunctions, seeking to enjoin Rachel from receiving direct payment of the retirement benefits and seeking to suspend Richard's obligation under the divorce decree to pay Rachel a portion of the retirement benefits. On February 20, 1997, Richard filed an amended motion for clarifying order and enforcement of the divorce decree, an action against Rachel and her attorneys for conspiracy and fraudulent concealment, and a suit for declaratory judgment that

---

4. He also sought summary judgment on his motion for leave to file the grievances against

Rachel's attorneys.

the marriage and decree were void. On February 24, he filed an amended motion for summary judgment on his "entire claim" against all of the defendants. On February 28, Richard filed a motion for sanctions and Rachel filed a motion for an order to cease and desist, seeking an injunction against Richard from filing any additional lawsuits or proceeding with any pending lawsuits against Rachel.

### The Order

On March 14, 1997, Judge Marsh conducted the final hearing on the parties' motions for summary judgment and injunctive relief. The final order, entered May 14, 1997,

- granted summary judgment to Rachel and her attorneys on the grounds that Richard's claims were barred by res judicata and statute of limitations;

- found that the partial summary judgment was an interlocutory order which was invalidated and superseded by the final judgment in the bill of review;

- found that the partial summary judgment was not a final judgment, was null and void and of no legal effect; and

- found that Richard had wrongfully attempted to influence officials by representing the order as a valid, binding, operative order of the court.

The court then entered a permanent injunction and permanent order to cease and desist, providing:

RICHARD CHANDLER is PERMANENTLY ENJOINED from and he is PERMANENTLY ORDERED TO CEASE AND DESIST in filing any new actions against or proceeding with any actions now pending against RACHEL CHANDLER, WILLIAM COPELAND, WELDON S. COPELAND, SR., WELDON S. COPELAND, JR., WALTER BOYAKI, JOHN MUNDIE, RALPH MIRANDA, and THE UNITED STATES OF AMERICA, INCLUDING THE UNITED STATES ARMY, THE UNITED STATES TREASURY, and all other AGENCIES, BRANCHES, OR COMPONENT PARTS OF THE UNITED STATES GOVERNMENT.[5]

RICHARD CHANDLER is further and additionally permanently enjoined from and he is permanently Ordered to cease and desist from representing or contending to any public officials in any form or forum that the Decree of Divorce rendered by this Court on May 28, 1980, in Cause No. 77–1540 in [sic] null or void or invalid or otherwise not a valid final judgment.

RICHARD CHANDLER is further and additionally permanently enjoined from and he is permanently Ordered to cease and desist from representing or contending to any public officials in any form that his marriage to RACHEL CHANDLER was null or void or invalid or otherwise not lawful or legal.

RICHARD CHANDLER is further and additionally permanently enjoined from and he is permanently Ordered to cease and desist from representing or contending to any public officials in any form or forum that the document filed in Cause No. 87–5225 on May 25, 1990, entitled 'ORDER GRANTING PARTIAL MOTION FOR SUMMARY JUDGMENT' is a valid final judgment.

By ten points of error, Richard challenges the trial court's judgment. We first address the rules of *pro se* representation.

### *PRO SE* REPRESENTATION

▪▪ At various times throughout the history of this litigation, Richard has opted to represent himself. With regard to the proceedings at issue in this appeal, he has appeared in the trial court below and in this court *pro se*. Litigants choosing to appear *pro se* must comply with the applicable procedural rules and are held to the

---

5. Aside from Rachel, all of the named individuals are current or former attorneys involved in the Chandler litigation.

same standards that apply to licensed attorneys. *In re Estate of Dilasky,* 972 S.W.2d 763 (Tex.App.—Corpus Christi 1998, no pet.); *Greenstreet v. Heiskell,* 940 S.W.2d 831, 834 (Tex.App.—Amarillo 1997, no writ); *Clark v. Yarbrough,* 900 S.W.2d 406, 409 (Tex.App.—Texarkana 1995, writ denied). No allowance is to be made for the fact that a litigant is not an attorney. *Weaver v. E–Z Mart Stores, Inc.,* 942 S.W.2d 167, 169 (Tex.App.—Texarkana 1997, no writ). To treat him differently would accord him an unfair advantage over litigants represented by counsel. *Mansfield State Bank v. Cohn,* 573 S.W.2d 181, 184 (Tex.1978); *Lin v. Houston Community College System,* 948 S.W.2d 328, 336 (Tex.App.—Amarillo 1997, writ denied). We apply these principles to the matters before us.

## THE APPOINTMENT OF JUDGE MARSH

In his first three points of error, Richard contends that it was error for Judge Marsh not to recuse himself upon receipt of Richard's initial letter of objection, that it was error for Judge Rivera to deny the motion to recuse Judge Marsh, and that Judge Rivera erred in not filing findings of fact and conclusions of law following the recusal hearing. Additionally, while not raising it as a designated appellate issue, Richard contends that the appointment of visiting judges is improper and unfair, and should be of concern to this Court.

### *Statutory Strikes*

#### *Statutory Authority*

The Texas Government Code grants to the presiding judge of an administrative judicial region the power to assign visiting judges. Tex.Gov't Code Ann. § 74.056 (Vernon 1998). Richard contends that a visiting judge may only be appointed in the absence of the presiding judge. Although the Government Code allows for the assignment of a visiting judge in the absence of the presiding judge, this provision is not exclusive. Tex.Gov't Code Ann.

§ 74.056(c). Subsection (a) of § 74.056 specifically allows for the assignment of visiting judges in order to dispose of accumulated business. This procedure allows for courts to ease the heavy burden of already crowded dockets.

Claiming that the use of visiting judges is unfair, Richard argues that such a "dial-a-judge" system should be of concern to this Court. Overcrowded dockets are a major concern for every court, including the courts of appeals. The appointment of judges to assist in the disposal of cases on crowded dockets is allowed by the Texas Legislature in an attempt to ease this burden on the courts and to expedite the disposition of cases. We will be the first to recognize that the use of visiting judges has generated a great deal of public scrutiny. In a recent unanimous opinion, the Texas Supreme Court detailed the statutory development of the system authorizing the use of assigned judges. *Mitchell Energy Corp. v. Ashworth,* 943 S.W.2d 436, 438–40 (Tex.1997). Prior to 1957, only sitting district judges could be assigned to another court. Legislative amendments in 1957 authorized the appointment of retired judges who were sixty-five years of age with at least ten years experience to serve by assignment. Act of May 23, 1957, 55th Leg., R.S., ch. 408, § 1, 1955 Tex.Gen.Laws 1236; *Mitchell,* 943 S.W.2d at 438. Twenty years later, the Legislature added former district judges who had not been defeated for re-election and were below the age of seventy as an additional category of judges eligible for appointment. Act of April 21, 1977, 65th Leg., R.S., ch. 115, § 2, 1977 Tex.Gen.Laws 249; *Mitchell,* 943 S.W.2d at 438. Additional amendments followed in 1985 (qualifications revised to service of four years and omitting the prohibition against defeated judges), 1987 (judges eligible for appointment expanded to include retired or former statutory county court at law judges), and 1989 (litigants entitled to only one objection to an assigned judge of any kind). In 1991, the

debate intensified, focusing on the assignment of defeated judges:

The Legislature added subsection (d) to Section 74.053 as an amendment to House Bill 555 during the regular session of the 72nd Legislature in 1991. As initially proposed, House Bill 555 was intended to clarify the eligibility requirements to be assigned as a visiting judge. *See* COMMITTEE ON JUDICIAL AFFAIRS, BILL ANALYSIS, Tex. H.B. 555, 71st Leg., R.S. (1989). During a public hearing on the bill the Senate Jurisprudence Committee conducted, several senators expressed dissatisfaction with the extent assigned visiting judges were used, and urged that parties ought to have the right to have a locally elected judge decide their case. The Senators discussed a perceived problem, particularly in Harris County, that judges who had just been turned out of office by an election were returning to the same court as an assigned judge. The committee reported House Bill 555 with an amendment that would allow parties to object to the assignment of any judge other than current holders of elective office. *Public Hearing on H.B. 555 Before Senate Jurisprudence Committee,* 71st Leg., R.S., (May 14, 1991)(tape available through the Senate Staff Services Office).

. . .

Section 74.053 clearly is intended to give parties the right to veto the assignment of certain former judges. The problem which motivated the legislation was the perceived abuse of the assignment system, in particular the use of judges who had been recently rejected by the electorate.

The solution aimed at mitigating the problem was to allow parties to object to some, but not all, former judges. The line of demarcation is experience. However, the Legislature intended to measure a judge's experience not merely by time put in as a judicial officer, but by

service over a period of years with the approval of the electorate. The Legislature intended that a party may object to a former judge under Section 74.053(d), but not if the judge had served as an elected judge long enough to be vested under the retirement system. By promulgating Section 74.053(d), the Legislature distinguished two kinds of former judges: those who had vested when they left office, and those who had not.

*Mitchell,* 943 S.W.2d at 439–40.

Currently, TEX.GOV'T CODE ANN. § 74.053 provides:

§ 74.053. **Objection to Assigned Judge**

(a) When a judge is assigned under this chapter the presiding judge shall, if it is reasonable and practicable and if time permits, give notice of the assignment to each attorney representing a party to the case that is to be heard in whole or part by the assigned judge.

(b) If a party to a civil case files a timely objection to the assignment, the judge shall not hear the case. Except as provided by Subsection (d), each party to the case is only entitled to one objection under this section for that case.

(c) An objection under this section must be filed before the first hearing or trial, including pretrial hearings, over which the assigned judge is to preside.

(d) A former judge or justice who was not a retired judge may not sit in a case if either party objects to the judge or justice.

Pursuant to this statutory scheme, there are three categories of judges eligible for assignment, "regular," "retiree," and "former" judges.

A 'regular' judge is one who is a current officeholder of another court. TEX.GOV'T CODE § 74.054(a)(1), (a)(5), (b). A 'retiree' judge is one who, as discussed earlier, is a judge receiving an annuity under the Judicial Retirement System. The Code does not specifically define the

term 'former judge,' but the Code requires that both former and retiree judges have served as a regular judge for a minimum of forty-eight months. *Id.* § 74.055(c)(1), (e). Thus, a former judge for purposes of assignment may be defined as one who has served as a regular judge for at least forty-eight months, but who is not a retiree judge.[6] *Mitchell,* 943 S.W.2d at 439.

■ Thus, if a party to a civil case files a timely objection, the judge may not hear the case. TEX.GOV'T CODE ANN. § 74.053(b). Under this section, a timely objection is defined as one filed before the first hearing or trial, including pretrial hearings, over which the assigned judge is to preside. TEX.GOV'T CODE ANN. § 74.053(c). A litigant may object to a "regular" or "retiree" judge only once in a civil case. TEX.GOV'T CODE ANN. § 74.053(b). However, there is no limit to the number of objections which may be lodged against the assignment of a "former" judge. We turn now to the specific complaints concerning the appointment of Judge Herb Marsh.

■ Just as there are three classifications of assigned judges, there are three methods or remedies prescribed by our system of jurisprudence for the challenge to a judge. "Judges may be removed from a particular case either because they are constitutionally disqualified, TEX. CONST. art. V, § 11, because they are subject to a statutory strike, TEX.GOV'T CODE § 74.053(d), or because they are recused under rules promulgated by [the Supreme] Court. TEX.R.CIV.P. 18a, 18b; TEX. R.APP.P. 16." *In re Union Pacific Resources Company,* 969 S.W.2d 427, 428 (Tex.1998). Our first inquiry is whether Judge Marsh was properly appointed to hear any or all of the Chandler proceedings. Second, we will address whether Richard properly objected to the appoint-

ment of Judge Marsh, and if so, whether he later waived it.

### General or Blanket Assignment

On January 17, 1995, Judge Mary Anne Bramblett requested that the presiding judge of the Sixth Administrative Region assign Judge Herb Marsh to preside over *Chandler v. Chandler, et al.,* Cause No. 77–1540 for the duration of the case due to her crowded docket. The next day, Presiding Judge William E. Moody entered a written order of assignment, specifically noting:

> This assignment will begin on the 18th day of January 1995, and will continue for the period of time that may be deemed necessary for the assigned Judge to complete trial of any case or cases begun during this period, and to pass on motions for new trial and all other matters growing out of cases tried by the Judge herein assigned during this period.

Although the request for assignment specified a particular docket number of the case assigned, the assignment itself did not. Instead, it was a blanket assignment. Reading it together with the request, it appears that Judge Marsh was appointed to preside over Cause No. 77–1540 and all other matters "growing out of" that case.

■ Ordinarily, a visiting judge sitting under a general assignment and presiding over any pretrial hearing is authorized to hear all related proceedings, including a trial on the merits. *Bourgeois v. Collier,* 959 S.W.2d 241, 244 (Tex.App.—Dallas 1997, no writ); *Money v. Jones,* 766 S.W.2d 307, 308 (Tex. App.—Dallas 1989, writ denied). Several appellate decisions have referred to assignments containing the "growing out of" language utilized here. *See Starnes v. Chapman,* 793 S.W.2d 104, 105 (Tex. App.—Dallas 1990, orig. proceeding);

---

6. We pause to note that the debate over the use of visiting judges is ongoing. At least three bills have been presented for consideration in the 76th Legislative Session altering the qualifications of an assigned judge by requiring additional years of service on the bench and/or preventing assignment of a defeated judge in the county of defeat.

*Bourgeois,* 959 S.W.2d at 244. The two lawsuits in issue here, Cause No. 77–1540 and Cause No. 87–5225, stem directly from the same dispute—the validity or invalidity of the Chandler marriage, the Chandler divorce decree and Rachel's entitlement to an interest in Richard's military retirement benefits. Judge Marsh was specifically requested to preside over the cause number reflecting the original divorce action. The bill of review action grew directly out of the divorce action; indeed it sought to set aside the divorce decree itself. The additional filings relate to Richard's efforts to declare void the original decree of divorce, the bill of review judgment, the underlying marriage, and failing that, to clarify that Rachel was not entitled to direct payment of the benefits awarded her under the decree. We find no fundamental impediment to the use of the general or blanket assignment at issue here and conclude that Judge Marsh was properly appointed.

### The Objection

Richard asserts that his February 7, 1995 letter to Judge Moody constituted a timely objection and that Judge Marsh's removal was automatic. In his letter, he stated:

> 4. The judge requested to hear this case is Herb Marsh, whom I believe is the judge that refused to hear an injunction action concerning the same subject matter as the motion to clarify, which may indicate he has a bias against me.
>
> If I have been given formal notice of the assignment request for the purpose of my submitting objections or waiving such by not answering, I submit the foregoing for consideration and appropriate action. If such request is a form of recusal I would request that such be disclosed rather than the request be granted on grounds of a crowded docket.

> My only concern is having a fair and impartial hearing on my claim.

Upon receipt of the letter, Judge Marsh telephoned Richard in order to ascertain whether his letter constituted an objection to the appointment.[7] The parties agree in part, and disagree in part, as to the nature of the conversation. Judge Marsh described it as follows:

> By that letter I couldn't tell whether he was objecting to me hearing this case or not. And that's the reason I called him. I called him from Judge Bramblett's office and called his number in Lubbock. And I said, 'I have your letter here.' I said, 'I don't recall anything about what you have put in your letter. I don't recall any contact, any previous case. Would you explain to me what it was,' and he did. And he thought that I had refused to hear something in that '77 case. And I told him I had no recollection of it at all.
>
> He said it had something to do when his lawyer then had come in to see me in the courtroom. That was in '80–something, and had come back out and told him I wouldn't hear anything. I told him I had no recollection of that at all. But if he was objecting to me sitting on the case, I would honor his objection and not take the assignment. And he said, 'No, that's all right.' Said, 'Just go ahead. I agree that you hear the case and take on the case and do the hearings and summary judgments,' and I just go ahead and set them. So that's when we proceeded to set the April 6th hearing on summary judgments.

> . . .

> JUDGE RIVERA: And Mr. Chandler appeared at that first hearing of April 6th and participated in the hearing, and it was not until towards the end of the proceedings that he voiced dissatisfaction?

---

7. While Richard was under no duty to explain any objection he may have had, he was under a duty to disclose whether or not his letter constituted an objection.

JUDGE MARSH: He made no objection whatever at the April 6th hearing. None whatever.

We find Richard's sworn statements contained within his motion to recuse significant:

1. On January 17, 1995, the permanent judge of said court, the Honorable Mary Anne Bramblett, requested the assignment of Judge Marsh to preside over: *RICHARD CHANDLER VS. RACHEL CHANDLER,* 77–1540.

2. Thereafter, Judge Marsh consulted with plaintiff to determine whether there was objection to his presiding over said cause. Plaintiff indicated there had been an incident in the past that may prevent his being assigned to the case, but at the time all the facts could not be recalled.

3. Plaintiff advised Judge Marsh that there was more than one cause of action filed in the said court and he indicated that he would be presiding over such actions. However, there has never been any order consolidating the other action into 77–1540, or any order from the 6th Administrative Region assigning Judge Marsh to the other case filed in said court, Cause No. 87–5225.

*4. Thereafter, plaintiff indicated that he had no objection to Judge Marsh presiding over Cause No. 77–1540.* [Emphasis supplied].

The motion to recuse was signed and sworn to by Richard on June 23, 1995.

### *Waiver*

■ We disagree with Richard that the provisions of § 74.053(b) and (c) do not apply to challenges under § 74.053(d). Even an objection to a "former" judge, as opposed to a "retired" judge, must be timely.[8] The objection must be the first matter presented to the visiting judge for a ruling. *Morris v. Short,* 902 S.W.2d 566, 569 (Tex.App.—Houston [1st Dist.] 1995, writ denied). This requirement imposes an obligation on the complaining litigant to urge the objection at the commencement of the first hearing if it has not already been determined by the visiting judge stepping aside or by the administrative presiding judge directing the visiting judge to step aside. The objection must be presented to the assigned judge and ruled upon as a preliminary matter before the visiting judge is prohibited from hearing the case. *Texas Employment Commission v. Alvarez,* 915 S.W.2d 161, 164–65 (Tex.App.—Corpus Christi 1996, no writ). Because the protections of § 74.053 are nonconstitutional, the available objection is subject to waiver and must be presented and ruled upon to trigger any mandatory prohibition. *Id.* While we consider the letter to Judge Moody to be a timely written objection, we conclude Richard waived his entitlement to the statutory strike. He admittedly told Judge Marsh that he had no objection to his hearing matters arising from Cause No. 77–1540. After the telephone conversation, Richard forwarded to Judge Marsh motions and setting requests arising from both Cause No. 77–1540 and Cause No. 87–5225. Richard appeared at a hearing on April 6. He has not brought forward a reporter's record of that proceeding, nor has he ever suggested, through sworn testimony or otherwise, that he presented any objection to Judge Marsh presiding over Cause No. 87–5225 at the beginning of that hearing. Judge Marsh testified that Richard did not present any objection at any point during the April 6 hearing; in fact, the record reflects that he did not advise Judge Marsh of any complaint until the end of the June 23 hearing when he mentioned a motion to recuse. Once Judge Marsh presided over the April 6 hearing, which encompassed

---

8. The purpose of the rule was perhaps best explained in *Logic Sciences, Inc. v. Smith,* 798 S.W.2d 394, 395 (Tex.App.—Houston [1st Dist.] 1990, orig. proceeding). "To allow untimely objections such as this would encourage litigants to delay objections until they 'get a feeling' for how a judge is going to rule in a case—a situation the statute is designed to prevent." *Id.* at 395.

both Cause Nos. 77–1540 and 87–5225, without Richard urging his objection, he waived his entitlement to the statutory strike.[9] Later efforts to cure his error, through the portions of the motion to recuse addressing § 74.053, the subsequent motion to challenge visiting judge, filed November 17, 1995, and the last objection to visiting judge, dated November 30, 1995, were untimely and of no avail.

## THE MOTION TO RECUSE

### The Grounds

On June 29, 1995, Richard filed a motion to recuse Judge Marsh alleging:

• Judge Marsh demonstrated bias against Richard such that he cannot preside fairly over the proceedings; and

• Judge Marsh had personal knowledge of a disputed fact in the case and cannot preside fairly over the proceedings.

In support of these allegations, Richard alleged that he had been a defendant in an action styled *Alamo Pipe and Supply v. Richard L. Chandler, Individually, and d/b/a Skyline Plumbing and Hardware* which was filed in the 243rd Judicial District Court when Judge Marsh was the presiding judge:

Plaintiff had knowledge that plaintiff Alamo was represented by attorney Robert T. Schwarzbach, who, prior to Judge Marsh's taking the bench was in the partnership of Schwarzbach—Gade—Marsh. After a hearing in the *Alamo* case, attorney Gade was advised by plaintiff that Judge Marsh may be asked to recuse himself because of his prior relationship with Alamo's attorney.

Thereafter, plaintiff was advised of Judge Marsh's displeasure with the recusal suggestion.

About 1985, plaintiff was seeking an injunction against Rachel Chandler preventing her from receiving direct payment of his retired pay. At that time she was represented by Weldon S. Copeland, Jr. who is also a third-party defendant in Cause No. 77–1540. On the date for the 1985 injunction hearing the judge of the 41st district court was not available and Judge Marsh was asked to hold the hearing which concerned Army retired pay.

After some discussion of the injunction Judge Marsh declined to hear the injunction on the basis that plaintiff raised his association with Alamo and had suggested his recusal.

In this case, the same injunction has again been presented to Judge Marsh and he simply refuses to rule on it in any manner.

### The Hearing

A hearing on the motion to recuse was held on September 13, 1995 before Judge Rivera. Richard testified in accordance with the allegations set forth in the motion. In turn, Judge Marsh testified:

The original reason for his objection to me, I mean, that February letter where he mentioned some involvement with that '77 case, I guess it was, I think that case is up there on your bench—

. . .

And I looked through it at one point. I found one order that I had signed in that case as presiding for Judge McKellips,[10] and it says Herb Marsh, Jr., and

9. Richard suggests that his entitlement to the statutory strike cannot be waived, citing this Court's opinion in *Lone Star Industries, Inc. v. Ater,* 845 S.W.2d 334 (Tex.App.—El Paso 1992, orig. proceeding). We find his reliance misplaced. There, Judge Ater had not at the time of his assignment designated his election to serve as an assigned judge. Finding that the question of the qualification of a retired judge to serve on assignment is a jurisdictional question, the court concluded that the rela-

tor had not waived his right to object. *Id.* at 336. There has been no allegation raised here that Judge Marsh had not complied with the prerequisites to appointment as a visiting judge. Inasmuch as jurisdiction has not been implicated, *Lone Star* is inapplicable.

10. Judge McKellips was the presiding judge of the 41st District Court prior to his defeat by his successor, Judge Mary Anne Bramblett.

written under it, 'presiding,' which means it was something Judge McKellips had done and I was just signing it because he was gone or something. That's all it was. That's all it indicates. I don't recall—I have no recollection at all of anything ever—even that, I had to find that to even refresh my memory on that. But I heard no part of that case and I don't recall ever being asked to hear part of the case. And all the file reflects, I believe, is that I signed this one order, may have been setting a hearing or may have been denying an injunction or whatever. I signed it for Judge McKellips as presiding on something he'd already done. That's the only action I'd taken. And as to my knowledge, that's the only contact I've ever had with that case at all.

### The Ruling

At the conclusion of the hearing, Judge Rivera announced her ruling:

The Court finds that the objection filed by Mr. Chandler or the letter sent to Judge Moody by Mr. Chandler, if it states an objection, was waived by Mr. Chandler, and that he submitted to the court's jurisdiction, or to Judge Marsh's presiding over the matter, and thus, any objection was waived.

And the Court further finds that Mr. Chandler has not shown clearly or any legal basis for the Court granting the motion to recuse that I'm taking up here this afternoon, or no legal basis or grounds for the granting of the motion to recuse.

A written order denying the motion was signed on October 9, 1995. It provides:

On the 13th day of September, 1995, Plaintiff's Motion to Recuse and Disqualify Judge was heard and considered by the Court, and after considering the evidence presented in support of the Motion to Recuse and Disqualify Judge, the Court finds that there is not sufficient evidence to grant Plaintiff's Motion.

IT IS THEREFORE ORDERED, ADJUDGED and DECREED that Plaintiff's Motion to Recuse and Disqualify Judge is hereby denied.

In his second point of error, Richard asserts that it was an abuse of discretion for the trial court to deny his motion.

### Standard of Review

■ The standard of review for the denial of a motion to recuse is whether the trial court abused its discretion. *Aguilar v. Anderson,* 855 S.W.2d 799, 801 (Tex. App.—El Paso 1993, writ denied). The test for an abuse of discretion is whether the trial court acted without reference to any guiding rules or principles. *Id.* The fact that the trial court decided the issue differently than the reviewing court would have does not indicate an abuse of discretion. *Id.* Nor does a mere error in judgment rise to such a level. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985).

In some instances, Texas appellate courts have applied the reasonable person standard in determining whether a recusal motion should have been granted. *Ludlow v. DeBerry,* 959 S.W.2d 265, 281 (Tex. App.—Houston [14th Dist.] 1997, n.p.h.); *Aguilar v. Anderson,* 855 S.W.2d at 804–05 (Osborn, J. concurring opinion). A reasonable person standard is appropriate because the rule provides for recusal where a judge's impartiality might reasonably be questioned. Tex.R.Civ.P. 18b(2)(a). However, in applying the reasonable person standard, it must be determined whether the alleged act indicating bias or impartiality emanated from an extrajudicial source. *Ludlow,* 959 S.W.2d at 281.

The United States Supreme Court discussed the "extrajudicial source" doctrine in *Liteky v. U.S.,* 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). *Ludlow,* 959 S.W.2d at 271. Although the Court was construing the federal disqualification rule, it contains essentially the same language as Rule 18b. The Court stated that

opinions formed by the judge on the basis of facts introduced or events occurring during proceedings do not constitute a basis for a recusal motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. *Id.* Thus, the Supreme Court reasoned that judicial remarks during the course of a trial that are critical or disapproving or even hostile to counsel, parties, or their cases, ordinarily do not support recusal. *Id.* Such remarks *may* do so if they reveal an opinion deriving from an extrajudicial source and such remarks *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. *Id.*

■ In determining whether to apply the extrajudicial source rule when a litigant cites Rule 18b(2)(a), a court must consider the facts upon which recusal is sought. *Ludlow,* 959 S.W.2d at 282. Here, Richard complains of Judge Marsh's testimony at the recusal hearing. Richard asserts that "Judge Marsh's opposition was extraordinary and openly aligned him with appellees and against Richard...." Regardless of how a litigant phrases his motion to recuse or on which section of Rule 18b(2) he relies, the extrajudicial source rule applies to a recusal motion, such as the one in this case, that targets judicial statements regarding the case and made during the course of proceedings. *Ludlow,* 959 S.W.2d at 282–83. The fact that Judge Marsh gave testimony in contravention of Richard's allegations does not demonstrate anything other than factual disagreement.

### *Impartiality*

■ Applying the extrajudicial source rule to the facts of this case, Richard has not demonstrated an abuse of discretion. The actions he complains about arose during the recusal hearing, and he has not shown that these statements emanated from any source other than the judge's opinion based on his perception of the evidence presented. None of the state-

ments by Judge Marsh indicate such a "high degree of favoritism or antagonism as to make fair judgment impossible." *Ludlow,* 959 S.W.2d at 283, *citing Liteky,* 510 U.S. at 555, 114 S.Ct. at 1157. In fact, after a complete review of the record of the recusal hearing, we can find no statements made by Judge Marsh which would "openly align" him with Rachel. Judge Marsh gave a procedural recitation, but he made no statements in favor of or against either of the parties.

Richard also contends that Judge Marsh's "opposition and active participation in the recusal proceedings can only lead to his recusal." In support of his contentions, Richard cites to *Monroe v. Blackmon,* 946 S.W.2d 533, 538 (Tex. App.—Corpus Christi 1997, no writ) and *Blanchard v. Krueger,* 916 S.W.2d 15 (Tex. App.—Houston [1st Dist.] 1995, orig. proceeding). His reliance is misplaced. In *Monroe,* a litigant sought the recusal of the trial judge because the opposing counsel represented the judge in a separate proceeding. In *Blanchard,* the trial judge who was the subject of the recusal action took the extraordinary step of filing a general denial and request for attorney's fees, thus becoming a party to the underlying suit. At that point, the judge's disqualification was mandatory inasmuch as he had become a party to the suit and was seeking damages in the form of attorney's fees.

■ That is not the case here. Merely testifying at a hearing does not constitute "active participation." Further, we disagree with Richard's suggestions in this Court that the basis for his motion to recuse was constitutional disqualification. "No judge shall sit in any case wherein he may be interested, or where either of the parties may be connected with him, either by affinity or consanguinity, within such a degree as may be prescribed by law, or when he shall have been counsel in the case." TEX. CONST. art. V, § 11. To warrant constitutional disqualification, a judge's "interest" must be a direct pecuniary or property interest in the subject

matter of the litigation. *Palais Royal, Inc. v. Partida,* 916 S.W.2d 650, 653 (Tex. App.—Corpus Christi 1996, orig. proceeding). While a judge's ability to be fair is an appropriate issue for consideration in a recusal action under the Texas Rules of Civil Procedure, "fairness" is not a consideration in constitutional disqualification. *Gulf Maritime Warehouse Co. v. Towers,* 858 S.W.2d 556, 558 (Tex.App.—Beaumont 1993, writ denied). We conclude that it was not an abuse of discretion for Judge Rivera to deny Richard's motion to recuse on the basis of impartiality.

### Failure to Allow Richard to Develop Record

■ Richard next contends that Judge Rivera abused her discretion by failing to allow him to develop a record to support his motion. At the inception of the hearing, the following exchange between Richard and the court took place:

JUDGE RIVERA: Would you announce for the record, sir, your name.

CHANDLER: Yes, ma'am. Name is Richard Chandler. And I'm pro se and I'm—

JUDGE RIVERA: All right. Would you please present your evidence to the Court, sir.

CHANDLER: Does the Court wish that I take the stand to be sworn to enter the evidence, or can I just enter the evidence? [11]

JUDGE RIVERA: What is your evidence going to consist of?

CHANDLER: I have about 12 or 13 exhibits.

JUDGE RIVERA: First of all, let's focus on what it is that you are representing to the Court.

Thereafter, Richard proceeded to outline his case for approximately six pages in the

record. At no time during the hearing did Richard attempt to offer any exhibits into evidence even though he had ample opportunity to do so. Richard made no complaint during the hearing that he was not allowed to present his evidence or exhibits. In fact, during the course of the hearing, Judge Rivera asked Richard several times if he had anything to add, at which time he had the opportunity to expand on his case. Since Richard failed to complain to the trial court and obtain a ruling on his complaint, he has failed to preserve the issue for appellate review. Tex.R.App.P. 33.1(a)(1).

### Oral Order vs. Written Order

■ Richard's next contention is that the order entered October 9, 1995 is substantially different from the finding announced at the hearing. This argument is without merit. As we have detailed above, the motion was denied on the basis that Richard failed to present sufficient evidence in order for the court to grant his motion. The record indicates that Judge Rivera stated that "the Court further finds that Mr. Chandler has not shown clearly or [given] any legal basis for the Court granting the motion to recuse ... or no legal basis or grounds for the granting of the motion to recuse." The order entered on October 9, 1995, states that "after considering the evidence presented in support of the Motion to Recuse and Disqualify Judge, the Court finds that there is not sufficient evidence to grant Plaintiff's Motion." While the verbiage is not *exactly* the same, we cannot find that it is substantially different. Both the oral order and the written order deny the motion on the grounds that Richard failed to produce evidence which would support the court's granting of the motion. Further, Richard's reliance on *Keim v. Anderson,* 943 S.W.2d 938 (Tex.App.—El Paso 1997, no

11. In his brief, Richard makes a passing reference to the fact that none of the parties were sworn during the hearing, which he contends is a violation of due process. Our review of the record indicates that Richard never requested that Judge Marsh be sworn nor objected to the trial court's failure to swear the witnesses. Accordingly, he has waived error. Tex.R.App.P. 33.1(a).

writ) is misplaced. *Keim* addressed the issue of the oral rendition of judgment. Judge Rivera did not render judgment on the merits, she ruled on a pretrial motion.

### Inaccurate Case Number

■ Richard complains that the order denying the motion to recuse was entered in Cause No. 87–5225. He suggests that this was improper and implies it constitutes error because Judge Rivera knew that Judge Marsh was only assigned in Cause No. 77–1540 and that the motion to recuse was filed in Cause No. 77–1540. Throughout the pendency of this case, there has been confusion regarding the case numbers. The record is replete with pleadings on file having one case number while others have both case numbers. The motion to recuse was filed under Cause No. 77–1540, while the order denying the motion was filed under Cause No. 87–5225. We have already concluded that the general assignment of Judge Marsh encompassed both causes of action. Any discrepancy was merely a *de minimus* typographical error. Inasmuch as error, if any, was *de minimus*, it was harmless and does not invalidate the order. *Ex parte Benitez*, 590 S.W.2d 704, 707 (Tex.1979); *Ex parte Williams*, 866 S.W.2d 751, 754 (Tex.App.—Houston [1st Dist.] 1993, no writ).

### Findings of Fact and Conclusions of Law

Richard's final contention regarding the denial of his motion to recuse is that the trial court erred in failing to file findings of fact and conclusions of law as requested. In Point of Error Three, Richard presumably [12] is arguing that the judgment must be reversed because the trial court failed to issue separate written findings of fact and conclusions of law. We disagree.

A party may request that the court file its findings of fact and conclusions of law in any case tried without a jury. Tex. R.Civ.P. 296. The purpose of the rule is to give a litigant the right to findings of fact and conclusions of law following a conventional bench trial on the merits. *IKB Industries (Nigeria) Ltd. v. Pro–Line Corp.*, 938 S.W.2d 440, 442 (Tex.1997). In other cases findings and conclusions are proper, but a party is not entitled to them. *Id.*

■ A hearing on a motion to recuse is not a "case tried without a jury;" it is purely a pretrial matter. While findings in certain pretrial and post-trial matters may be helpful, they are not required. *Osborn v. Osborn*, 961 S.W.2d 408, 411 n. 3 (Tex. App.—Houston [1st Dist.] 1997, pet. denied) (hearing on motion for new trial is not a "case tried . . . without a jury," but findings can be helpful); *IKB Industries (Nigeria) Ltd.*, 938 S.W.2d at 442 (findings not required where judgment rendered as sanction for discovery abuse, but findings for imposing sanctions may be helpful). In a case like this one in which an order is entered denying the motion to recuse, findings for denying the motion may be helpful, but they are not required. *Id.* As a practical matter, they are often unnecessary, and requiring them in every case would unduly burden trial courts. *Id.*

■ Even if we were to decide that Richard was entitled to findings, we would conclude that any error was harmless. As a general rule, the failure of the trial court to file findings of fact constitutes error where the complaining party has complied with the requisite rules to preserve error. *Martinez v. Molinar*, 953 S.W.2d 399, 401 (Tex.App.—El Paso 1997, no pet.); *Wagner v. Riske*, 142 Tex. 337, 342, 178 S.W.2d 117, 119 (1944); *FDIC v. Morris*, 782 S.W.2d 521, 523 (Tex.App.—Dallas 1989, no writ). There is a presumption of harmful error unless the contrary appears on

---

12. In his brief, although Richard states that it was harmful error for the trial court not to file findings of fact and conclusions of law, he fails to request a remedy for the error. Therefore, we will presume that he is requesting this Court to reverse the trial court's order.

the face of the record. *Martinez,* 953 S.W.2d at 401; *City of Los Fresnos v. Gonzalez,* 830 S.W.2d 627 (Tex.App.—Corpus Christi 1992, no writ). Thus, the failure to make findings does not compel reversal if the record before the appellate court affirmatively demonstrates that the complaining party suffered no harm. *Martinez,* 953 S.W.2d at 401; *Las Vegas Pecan & Cattle Co., Inc. v. Zavala County,* 682 S.W.2d 254, 256 (Tex.1984). Where there is only one theory of recovery or defense pleaded or raised by the evidence, there is no demonstration of injury. *Martinez,* 953 S.W.2d at 401; *Guzman v. Guzman,* 827 S.W.2d 445 (Tex.App.—Corpus Christi 1992, writ denied); *Vickery v. Texas Carpet Co., Inc.,* 792 S.W.2d 759 (Tex. App.—Houston [14th Dist.] 1990, writ denied). *Accord, Landbase, Inc. v. T.E.C.,* 885 S.W.2d 499, 501–02 (Tex.App.—San Antonio 1994, writ denied)(failure to file findings and conclusions harmless where the basis for the court's ruling was apparent from the record).

■ The test for determining whether the complainant has suffered harm is whether the circumstances of the case would require an appellant to guess the reason or reasons that the judge has ruled against him. *Sheldon Pollack Corp. v. Pioneer Concrete of Texas, Inc.,* 765 S.W.2d 843, 845 (Tex.App.—Dallas 1989, writ denied); *Fraser v. Goldberg,* 552 S.W.2d 592, 594 (Tex.Civ.App.—Beaumont 1977, writ ref'd n.r.e.). In this case, we need not guess as to the reason the trial judge ruled against Richard in his motion to recuse. The order (both oral and again as written) clearly states that the motion was denied on the basis that Richard failed to present sufficient evidence. Therefore, the order of the trial court properly identified the basis of its ruling and it was not error for the trial court to refuse to file separate findings of fact and conclusions of law.

Having found that the appointment of Judge Marsh was proper, that it was not an abuse of discretion to deny the motion to recuse and that it was not error for the trial court to refuse to file findings of fact and conclusions of law regarding the hearing on the motion to recuse, we overrule the first three points of error.

## NO VARIANCE EXISTS

■ In Point of Error Four, Richard contends that the trial court erred in entering its written order of May 12, 1997 without having set aside its oral rendition of judgment announced at the conclusion of the hearing on March 14, 1997. Specifically he argues that "the oral judgment of March 14th was final and the trial court could not entertain a motion for summary [sic] after the time for filing a motion for new trial expired which was April 13, 1997." In support of this argument, he once again cites us to *Keim,* 943 S.W.2d at 942.

■ In *Keim,* the trial court had granted interim attorney's fees in favor of Mrs. Keim's attorney, which were only paid by Dr. Keim in part. On June 20, 1995, Kathleen Anderson, Mrs. Keim's attorney, withdrew of record. Ten days later, the parties appeared with their attorneys in open court and announced a Rule 11 stipulation, which was filed of record. The stipulation did not include the requirement that Dr. Keim pay the interim attorney's fees which had previously been ordered. During the prove-up of the agreement, both of the parties testified that they had entered into the agreement after consultation with their respective attorneys. The agreement encompassed conservatorship, child support, and the division of marital assets. No one mentioned the resolution of the temporary orders or the order for interim fees. The trial court accepted the stipulation and granted the divorce. Later that afternoon, Anderson filed a petition in intervention, seeking to enforce the interim fee award. On July 31, 1995, Mrs. Keim filed a motion for entry of judgment in accordance with the stipulated agreement. Dr. Keim objected to the untimeliness of Anderson's intervention. Following a

hearing, the trial court overruled the objection to the intervention, took judicial notice of the prior interim fee award, and ruled that the interim fee order had not been withdrawn by the stipulation and that it would be included in the final decree of divorce. On appeal, Dr. Keim contended that the trial court could not alter the parties' stipulated agreement, upon which the trial court had rendered judgment, without setting aside the prior ruling. This Court first determined that judgment had been orally rendered at the June 30 hearing, that Anderson's intervention could not be filed or considered after judgment unless the prior judgment was set aside, that the trial court had not set aside the prior judgment before considering the petition in intervention, and that reversible error had occurred. The oral rendition of judgment accepting and approving the stipulated agreement of the parties differed from the final written order. It was the variance that was impermissible. We concluded that "[i]f an appellate court determines that the decree contains terms and provisions dividing the community property that were never agreed to by the parties, it must reverse the judgment and remand the cause." *Id.* at 946, *citing In the Matter of the Marriage of Ames,* 860 S.W.2d 590, 594 (Tex. App.—Amarillo 1993, no writ). However, when the record reflects merely a clerical variance between a judgment announced in open court and the judgment eventually signed by the trial court, an appellate court may modify the judgment to correct the mistake. *Keim,* 943 S.W.2d at 946, *citing McLendon v. McLendon,* 847 S.W.2d 601, 610 (Tex.App.—Dallas 1992, writ denied). In comparing the oral pronouncement with the written final order here, we find no fatal variance, and Richard points us to none. Lastly, we disagree with Richard that the trial court lost plenary power on April 13, 1997. Pursuant to Tex.R.Civ.P. 329b(d), the trial court has plenary power to grant a new trial or to vacate, modify, correct, or reform the judgment within thirty days after the

judgment is signed. Accordingly, Judge Marsh was well within its plenary power when the final judgment was signed on May 12. Point of Error Four is overruled.

## SUMMARY JUDGMENT

In Points of Error Five, Six, and Ten, Richard asserts that the trial court erred in granting Rachel's motion for summary judgment, in denying his own motion for summary judgment and in denying his motion to declare his marriage to Rachel void. Richard's motion, filed under both Cause No. 77–1540 and No. 87–5225, sought summary judgment on "his entire claim" and specifically requested a finding that:

• direct payment of the military retirement benefits by USAFAC to Rachel violates both USFSPA and the terms of the decree of divorce;

• the Chandler marriage is void;

• the decree of divorce is void; and

• the final judgment in the bill of review action is void.

Rachel sought summary judgment on the basis that Richard could not recover on any of his requests for declaratory judgment because his claims were barred by *res judicata.* As to his request for clarification of the divorce decree, Rachel contended Richard lacked standing and that there had been no unintended results because of the Army's direct payment of the benefits to her. She also alleged that the direct payment provisions of USFSPA were applicable to the divorce decree. Lastly, Rachel and her attorneys sought summary judgment as to Richard's suit for conspiracy, fraudulent concealment, and breach of fiduciary duty on the basis that the statute of limitations barred his claim. The standard of review upon appeal of a summary judgment is whether the successful movant at the trial level carried its burden of showing that there is no genuine issue of material fact and that a judgment should be granted as a matter of law. *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991); *Nixon v. Mr. Property*

*Management Co., Inc.*, 690 S.W.2d 546, 548 (Tex.1985); *Cortez v. Liberty Mutual Fire Ins. Co.*, 885 S.W.2d 466, 469 (Tex. App.—El Paso 1994, writ denied). Thus, the question on appeal is not whether the summary judgment proof raises fact issues as to required elements of the movant's cause or claim, but whether the summary judgment proof establishes, as a matter of law, that there is no genuine issue of material fact as to one or more elements of the movant's cause or claim. *Gibbs v. General Motors Corporation*, 450 S.W.2d 827, 828 (Tex.1970).

In resolving the issue of whether the movant has carried this burden, all evidence favorable to the non-movant must be taken as true and all reasonable inferences, including any doubts, must be resolved in the non-movant's favor. *Nixon*, 690 S.W.2d at 548–49; *DeLuna v. Guynes Printing Company of Texas, Inc.*, 884 S.W.2d 206, 208 (Tex.App.—El Paso 1994, writ denied). Where the defendants are the movants and they submit summary judgment evidence disproving at least one essential element of each of plaintiff's causes of action, then summary judgment should be granted. *Perez*, 819 S.W.2d at 471; *Bradley v. Quality Service Tank Lines*, 659 S.W.2d 33, 34 (Tex.1983); *Cortez*, 885 S.W.2d at 469. Furthermore, when a trial court's order granting summary judgment does not specify the ground or grounds relied on for the ruling, summary judgment will be affirmed on appeal if any of the theories advanced are meritorious. *State Farm Fire & Casualty Co. v. S.S. & G.W.*, 858 S.W.2d 374, 380 (Tex.1993); *Rogers v. Ricane Enterprises, Inc.*, 772 S.W.2d 76, 79 (Tex.1989).

Here, the final judgment specifies that Richard's claims were fully resolved by the final decree of divorce and the subsequent bill of review judgment such that his asserted causes of action are barred by *res judicata*. This finding addresses Richard's requests that the marriage, the divorce decree, and the bill of review judgment be declared void. The final order further specified that the bill of review action alleged fraud, that Richard had notice or should have had notice of any causes of action no later than June 5, 1987 and that all actions filed by him after June 5, 1991 are barred by limitations. This finding addresses Richard's claims against Rachel and her attorneys for conspiracy, fraudulent concealment, and breach of fiduciary duty.

We first address whether the doctrine of *res judicata* barred certain of Richard's claims. If so, then denial of his motion and the granting of Rachel's motion were not error.

### *Res Judicata*

Upon discovering that his marriage may have been void under former TEX.FAM. CODE ANN. § 2.22 (Vernon 1996),[13] Richard filed a petition for bill of review which was ultimately assigned Cause No. 87–5225. In his petition, Richard requested "that the Court set aside and cancel the settlement agreement signed by [Richard] and [Rachel]" and "that the Court order a division of the estate of the parties in a manner that the Court deems just and right." Significantly, the petition did not seek a declaration that the Chandler marriage was void, nor did it seek a declaration that the decree of divorce was void. It merely asked that the property settlement agreement be set aside and that the court redivide the property of the parties.

13. Title 1 of the Texas Family Code was recodified by Acts 1997, 75th Leg., R.S., ch. 7, § 1, 1997 TEX.GEN.LAWS 8, eff. April 17, 1997. Specifically former § 2.22 has been recodified as § 6.202(a). *Id.*, at 26. Section 4 of the Act provides that "[t]he change in law made by this Act does not affect a proceeding under the Family Code pending on the effective date of this Act. A proceeding pending on the effective date of this Act is governed by the law in effect at the time the proceeding was commenced...." Acts 1997, 75th Leg., R.S., ch.7, § 2, 1997 TEX.GEN.LAWS 43. Because this proceeding was commenced prior to the recodification, we refer to the former statutory provisions.

A bill of review is an independent equitable action that a party to a previous action brings seeking to set aside the prior judgment that is no longer appealable or subject to the trial court's plenary power. *Baker v. Goldsmith,* 582 S.W.2d 404, 406 (Tex.1979); *Lawrence v. Lawrence,* 911 S.W.2d 443, 446 (Tex. App.—Texarkana 1995, writ denied). After the expiration of plenary power, the trial court cannot set aside a judgment except by bill of review for sufficient cause, filed within the time allowed by law. TEX.R.CIV.P. 329b(g); *Lawrence,* 911 S.W.2d at 446–47. To be successful in a bill of review, the plaintiff must allege and prove:

- a meritorious defense to the cause of action alleged to support the judgment,
- which fraud, accident, or the opposing party's wrongful act prevented him from presenting,
- without any fault or negligence of his own.

*Baker,* 582 S.W.2d at 406–07; *Lawrence,* 911 S.W.2d at 447. The plaintiff must as a pretrial matter present *prima facie* proof to support the meritorious defense. *Baker,* 582 S.W.2d at 408; *Lawrence,* 911 S.W.2d at 447. The relevant inquiry is not whether the result would be different on retrial, but instead whether the defense is barred as a matter of law and whether the complainant will be entitled to judgment if no evidence to the contrary is offered. *Baker,* 582 S.W.2d at 408–09; *Lawrence,* 911 S.W.2d at 447; *Brooks v. Associates Financial Services Corp.,* 892 S.W.2d 91, 94 (Tex.App.—Houston [14th Dist.] 1994, no writ). This is a question of law. *Baker,* 582 S.W.2d at 408–09; *Brooks,* 892 S.W.2d at 94. If the court determines that the plaintiff has not made out a *prima facie* meritorious defense, it ends the proceeding and dismisses the suit. *Baker,* 582 S.W.2d at 409; *Lawrence,* 911 S.W.2d at 447. The court will proceed to trial only if a *prima facie* meritorious defense has been set forth. *Baker,* 582 S.W.2d at 409; *Lawrence,* 911 S.W.2d at 447.

On May 25, 1990, the trial court granted partial summary judgment, finding that Richard had presented a *prima facie* meritorious defense and was entitled to a trial on the merits. We emphasize that the order *did not* hold that Richard's marriage to Rachel was void, nor could it, inasmuch as Richard had not sought that relief. A summary judgment may not grant more relief than requested. *Mafrige v. Ross,* 866 S.W.2d 590, 592 (Tex.1993).

On March 18, 1991, the case proceeded to trial before a jury. The jury found that Rachel had not knowingly made false representations to Richard in order to induce him to enter into marriage. Although Richard based his theory of recovery on the issue of whether the marriage was void, that issue was not submitted to the jury for a factual determination. Nor did Richard request that the trial court, as a matter of law, declare the marriage void. Although he appealed the final judgment of the trial court, he failed to raise on appeal the issue of whether the marriage was void. Instead, he challenged the sufficiency of the evidence, contending that the jury's failure to find that Rachel fraudulently induced him to marry her was against the great weight and preponderance of the evidence. In finding the evidence sufficient, the court recounted the controverting evidence tendered by Rachel to rebut the *prima facie* showing. *Chandler,* 842 S.W.2d at 833.

Accordingly, the partial summary judgment did not constitute a declaration that the marriage was void. Moreover, we further reject Richard's argument that it constituted a final judgment such that the later take-nothing judgment entered against him in the bill of review action is void. Our inquiry does not end there, however. We must next determine whether the bill of review judgment operates as a bar to this lawsuit. We conclude that it does.

■ Texas uses a transactional approach in examining whether a claim is barred by *res judicata*. *Barr v. Resolution Trust Corp.*, 837 S.W.2d 627, 631 (Tex. 1992); *Campos v. Ysleta General Hospital, Inc.*, 879 S.W.2d 67, 73 (Tex.App.—El Paso 1994, writ denied). The principles of the doctrine mandate that a party may not dispute matters distinctly put in issue and directly determined by a court of competent jurisdiction in a prior suit as a ground of recovery or defense in a later suit between the same parties. *Marange v. Marshall*, 402 S.W.2d 236, 239–40 (Tex.Civ. App.—Corpus Christi 1966, writ ref'd n.r.e.). Not only does *res judicata* apply as a bar in a later lawsuit between identical parties who appeared in a prior lawsuit if the cause of action asserted in the later lawsuit has been decided previously with finality by a court of competent jurisdiction,[14] it also bars the litigation of an issue which through the exercise of diligence could have been raised in the previous lawsuit. *Campos*, 879 S.W.2d at 73.

■ Richard could have sought a declaration in the bill of review litigation that the underlying marriage was void. He chose not to do so. Instead, he sought to set aside the property division, and obtain a re-division, because of Rachel's purported fraud. The doctrine of *res judicata* was designed to address precisely the situation at issue. Richard has filed no less than ten lawsuits across the state of Texas seeking a declaration that the marriage was void. He testified:

> QUESTION: Mr. Chandler, please do not take offense to this, because I don't mean it to be that way. What will it take for you to stop filing lawsuits against Rachel Chandler or against other people contending, among other things, that you never had a valid marriage to Rachel Chandler, that the marriage was not valid; what will it take you to stop filing those lawsuits?

RICHARD CHANDLER: Well, until somebody says that the divorce decree is valid and somebody says that the marriage is not void, that has not been determined. No court has said that the marriage is valid.

■ Let us be clear. Richard's marriage to Rachel is not void. When two or more marriages of a person to different spouses are alleged, the most recent marriage is presumed to be valid as against each marriage that precedes the most recent marriage until one who asserts the validity of a prior marriage proves the validity of the prior marriage. TEX.FAM. CODE ANN. § 2.01 (Vernon 1996).[15] We thus begin with the presumption that the Chandler marriage is valid. Richard shouldered the burden of establishing otherwise. He attempted to do so through his bill of review action and he failed. While we agree with his premise that a void judgment is subject to a collateral attack, we disagree that a litigant may have two, three, five, or ten bites at the apple to establish that the underlying judgment is void. His bill of review action served as a collateral attack. He was unsuccessful in establishing that his marriage was void and that the decree of divorce was void. Having had his opportunity, the bill of review judgment became *res judicata* of the issue. The decree of divorce, having withstood a collateral attack, is valid. Accordingly, it was not error for the trial court to deny Richard's motion for summary judgment to the extent it sought a declaration that the marriage was void, the decree of divorce was void, and that the final judgment in the bill of review action was void. Summary judgment in favor of Rachel was properly granted on the basis of *res judicata*.

### Statute of Limitations

Richard filed his second amended petition for conspiracy, fraudulent conceal-

---

14. *Texas Water Rights Comm'n v. Crow Iron Works*, 582 S.W.2d 768, 771–72 (Tex.1979).

15. Former § 2.01 has been recodified as § 1.102. Acts 1997, 75th Leg., R.S., ch. 7, § 1, 1997 TEX.GEN.LAWS 8, eff. April 17, 1997.

ment, and breach of fiduciary duty on February 20, 1997. As the basis for his suit he alleged:

• Rachel had represented to him that her first marriage had been dissolved by divorce, that there was no record evidencing any divorce, that the marriage was void, that Rachel was not a former spouse as contemplated by USFSPA, and that she was not entitled to direct payment of any military retirement benefits;

• In July of 1983, Rachel "solicited and obtained the assistance" of Weldon S. Copeland, Jr. "in a conspiracy to injure [Richard] by getting the Army to make direct payment of the $450.00 to Rachel." By agreement, Rachel and Copeland agreed to prosecute an enforcement against Richard for recovery of benefit arrearages. In return, Copeland was to receive one-third of the arrearages recovered up to $10,000.00 and one-third of each direct payment of $450.00 made by the Army to Rachel.

• In 1989, Weldon S. Copeland, Jr. withdrew as Rachel's attorney and was replaced by William Copeland, "who entered into the conspiracy established between Rachel and Weldon with full knowledge of the facts."

• The goal of the conspiracy was to defraud Richard of $450.00 of his monthly retirement benefits. The goal was accomplished "because Rachel, with assistance of Weldon and William, fraudulently concealed the fact that she never judicially terminated her prior marriage."

• Rachel had a fiduciary duty to disclose to Richard that her prior marriage was not judicially terminated and her failure to disclose her undissolved prior marriage constituted a fraudulent concealment.

• Weldon and William knowingly participated in and facilitated the breach of Rachel's fiduciary duty.

Richard sought actual and punitive damages.

Fraudulent concealment is not an independent cause of an action; it is an affirmative defense to statutes of limitations. *Arabian Shield Development Co. v. Hunt,* 808 S.W.2d 577, 584 (Tex.App.—Dallas 1991, writ denied). Stated simply, it is a basis for application of the discovery rule. The plaintiff must show the existence of the underlying tort, the defendant's knowledge of the tort, the defendant's use of deception to conceal the tort, and the plaintiff's reasonable reliance on the deception. *Id.* Limitations begin to run from the time the fraudulent concealment is discovered or should have been discovered within the exercise of reasonable diligence. *Eichel v. Ullah,* 831 S.W.2d 42, 45 (Tex.App.—El Paso 1992, no writ). We construe Richard's pleadings as claims for conspiracy, fraud, and breach of fiduciary duty. Accordingly, we must first determine the applicable statute of limitations for each tort alleged, and secondly, the date on which Richard discovered the alleged tort. The statute of limitations for civil conspiracy is two years. Tex.Civ. Prac. & Rem.Code Ann. § 16.003(a)(Vernon Supp.1999); *In re Estate of Herring,* 970 S.W.2d 583, 586 (Tex.App.—Corpus Christi 1998, no pet.); *Connell v. Connell,* 889 S.W.2d 534, 541 (Tex.App.—San Antonio 1994, writ denied). Ordinarily, a claim for fraud or misrepresentation is governed by a four-year statute of limitations. Tex. Civ.Prac. & Rem.Code Ann. § 16.004(a)(3)(Vernon 1986); *Williams v. Khalaf,* 802 S.W.2d 651, 656–57 (Tex.1990). Because a breach of fiduciary duty subsumes a claim of constructive fraud, it is also governed by the four-year statute of limitations. *Estate of Herring,* 970 S.W.2d at 587.

Richard obtained information in June of 1981 which led him to believe that Rachel had not been divorced from her first husband. On August 29, 1983, Richard received a letter from USAFAC notifying him that Rachel would receive direct payment of her portion of the military

retirement benefits. All of these facts were known to Richard at the time he filed his bill of review action; indeed it was Rachel's purported misrepresentation that formed the basis of that suit. The latest date of any purported wrongdoing alleged in Richard's petition is 1989, the date on which William Copeland replaced Weldon S. Copeland, Jr. as Rachel's attorney.[16] Even if we were to broadly construe Richard's November 16, 1994 "Motion for Court to Grant Leave for Richard L. Chandler to File a Grievance Against William Copeland and Weldon S. Copeland and Motion to Declare Judgments Void"[17] as alleging tortious conduct by Rachel and her attorneys, the two-year statute of limitations ran no later than December 31, 1991 and the four-year statute of limitations expired no later than December 31, 1993. This suit was not filed until some ten months later. The second amended petition which specifically set forth the claims for conspiracy, fraud, and breach of fiduciary duty was not filed until February 20, 1997. Accordingly, Richard's claims are barred by limitations. Summary judgment granted on these claims in favor of Rachel and her attorneys was proper.

### Clarification

The remaining issue in our summary judgment consideration is Richard's motion for clarification of the decree of divorce. In his second amended petition, Richard alleged that the provision for the division of retirement benefits contained in the decree of divorce was unambiguous. He requested the court to "determine that movant and Rachel did not intend for the Army to make payment of the $450.00 to Rachel, but rather it was their intent that movant make such payment to Rachel if, as and when movant shall receive his Army retired pay." He sought summary judgment declaring that direct payment of the military retirement benefits by USA-FAC to Rachel violates both USFSPA and the terms of the decree of divorce. In his brief, he argues that at best, Rachel is a putative former spouse and not entitled to any of the military retirement benefits; that under the property settlement agreement, there was no intent that the Army make direct payments; and that USFSPA is not applicable to the Chandler divorce decree. We have already determined that the Chandler marriage was not void; as a result, Rachel is a former spouse as defined by USFSPA. We turn first to the issue of intent and second to the question of direct payment.

### Intent

■ Enforcement of the division of property awarded by a divorce decree is governed by Tex.Fam.Code Ann. § 3.71 (Vernon 1993)[18] which provides in relevant part as follows:

(a) [A] court may not amend, modify, alter, or change the division of property made or approved in the decree of divorce or annulment. Further orders may be entered to enforce the division, but these orders shall be limited to orders in aid of or in clarification of the prior order. The court may specify more precisely the manner of effecting the property division previously made if the substantive division of property is not altered or changed. . . .

**16.** The record does not contain a precise date as to the substitution of counsel. For purposes of considering the statute of limitations issue, we will accord Richard's pleading every deference and assume that the substitution occurred on December 31, 1989.

**17.** We reiterate that it was this pleading that commenced the lawsuit giving rise to the judgment at issue in this appeal.

**18.** Title 1 of the Texas Family Code was recodified by Acts 1997, 75th Leg., R.S., ch. 7, § 1, 1997 Tex.Gen.Laws 8, eff. April 17, 1997. Specifically former § 3.71 has been recodified as § 9.001 *et.seq. Id.* at 37. Because this proceeding was commenced prior to the recodification, we refer to the former statutory provisions.

(b) An order under this section that amends, modifies, alters, or changes the actual, substantive division of property made or approved in a final decree of divorce or annulment is beyond the power of the divorce court to enter and is unenforceable.

TEX.FAM.CODE ANN. § 3.71(a) and (b). A property settlement agreement, although incorporated into a final decree of divorce, is treated as a contract and its legal force and its meaning are governed by the law of contracts, not by the law of judgments. *McGoodwin v. McGoodwin*, 671 S.W.2d 880, 882 (Tex.1984); *Dechon v. Dechon*, 909 S.W.2d 950, 956 (Tex.App.—El Paso 1995, no writ). If a contract is unambiguous, the courts will give effect to the intention of the parties as expressed in the agreement. *Dechon*, 909 S.W.2d at 956. The entire agreement must be interpreted in such a way that all its provisions are given effect and that none are rendered meaningless. *See Soto v. Soto*, 936 S.W.2d 338, 341 (Tex.App.—El Paso 1996, no writ); *Praeger v. Wilson*, 721 S.W.2d 597, 600–01 (Tex.App.—Fort Worth 1986, writ ref'd n.r.e.). In other words, every attempt must be made to harmonize all of the provisions within the agreement. *Soto*, 936 S.W.2d at 341. Each provision must be considered with reference to the whole agreement. *Id.* A contract is ambiguous only if there is uncertainty as to which of two meanings is correct. *Dechon*, 909 S.W.2d at 956; *Kurtz v. Jackson*, 859 S.W.2d 609, 611 (Tex.App.—Houston [1st Dist.] 1993, no writ). Only if the agreement is ambiguous may parol evidence be considered. *Soto*, 936 S.W.2d at 341; *Phillips v. Parrish*, 814 S.W.2d 501, 503 (Tex.App.—Houston [1st Dist.] 1991, writ denied). Ambiguity is a question of law for the court. *Soto*, 936 S.W.2d at 341; *Pierce v. Pierce*, 850 S.W.2d 675, 679 (Tex.App.—El Paso 1993, writ denied). If the court determines that the language is ambiguous, the interpretation is a fact issue to be resolved by the fact finder. *Soto*, 936 S.W.2d at 342.

Orders for enforcement are limited to orders in aid or clarification of the prior order. *McPherren v. McPherren*, 967 S.W.2d 485, 490 (Tex.App.—El Paso 1998, no writ); *Dechon*, 909 S.W.2d at 956; former TEX.FAM.CODE ANN. § 3.71(a). Such orders may more precisely specify the manner of carrying out the property division previously ordered so long as the substantive division of the property is not altered. *McPherren*, 967 S.W.2d at 490; *Dechon*, 909 S.W.2d at 956. Former § 3.72(b) provided that a clarification order may only be made upon a finding, express or implied, that the original form of the division of property lacks sufficient specificity to be enforced by contempt. *Id.* Here, Richard's second amended petition specifically alleged that the decree was unambiguous and capable of enforcement by contempt. Accordingly, parol evidence of the parties' intent regarding direct payment was inadmissible. Instead, the intent must be construed from the four corners of the agreement. The decree specified:

IT IS ORDERED, ADJUDGED AND DECREED that Petitioner and Respondent shall execute all instruments necessary to effect this Decree and that Petitioner and Respondent shall have all appropriate and necessary writs, execution, and process, as many and as often as necessary to accomplish the execution and final disposition of this judgment.

The decree was signed by the parties and their respective attorneys, indicating approval as to both content and form. This provision assured each party that s/he would have all enforcement mechanisms available to accomplish the division of property. Richard admittedly stopped payment of Rachel's interest in the retirement benefits, leaving her in a position to obtain enforcement through any means available. We conclude that the agreement is unambiguous and that direct payment of the retirement benefits to Rachel violates neither the decree of divorce nor the specific intent of the parties. We next

address whether direct payment violates USFSPA.

### The Uniformed Services Former Spouses' Protection Act (USFSPA) [19]

#### The Way We Were

At the time of the Chandler divorce, military retirement benefits earned during marriage, both vested and contingent, were community property subject to division on divorce. *Cearley v. Cearley,* 544 S.W.2d 661, 662, 666 (Tex.1976). On June 26, 1981, the United States Supreme Court issued its decision in *McCarty v. McCarty,* 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981). The issue before the Court was whether, upon dissolution of marriage, federal law precludes a state court from dividing nondisability retired pay pursuant to state community property laws. Answering this question in the affirmative, the Court noted that only Congress could take action to afford the former spouse a remedy.

#### Enforceability of Pre–McCarty Decrees

Of immediate concern was the enforceability of pre-*McCarty* decrees in which a former spouse was awarded an interest in military retirement benefits. The Fifth Circuit determined in *Erspan v. Badgett,* 659 F.2d 26, *reh. denied en banc,* 659 F.2d 26, 28 (5th Cir.1981) that a 1963 Texas divorce decree was enforceable and entitled to *res judicata.* The Texas Supreme Court addressed the issue in *Segrest v. Segrest,* 649 S.W.2d 610, 613 (Tex.1983), holding that *McCarty* was not retroactive. For those cases which were on appeal at the time of the *McCarty* decision, the ruling was held to be applicable. *Trahan v. Trahan,* 626 S.W.2d 485, 487 (Tex.1981)(applying *McCarty* to a case pending in the Texas Supreme Court concerning a partition of military retirement

benefits); *Mattern v. Mattern,* 624 S.W.2d 400, 400 (Tex.App.—Fort Worth 1981, no writ)(applying *McCarty* to a case pending in the court of appeals concerning a division of military retirement benefits on divorce).

#### Passage of the Act

■ Congress responded quickly to the *McCarty* challenge. It passed the Uniformed Services Former Spouses' Protection Act (USFSPA) on August 18, 1982 and the bill was signed by then-President Reagan on September 8, 1982. By its terms, USFSPA took effect on February 1, 1983, but it provided that courts had the ability to effectuate divisions of military retired or retainer pay as of June 25, 1981. This date was the day before the issuance of the *McCarty* decision, demonstrating the intent of Congress to obliterate the effect of that ruling. By virtue of USFSPA, the ability to divide military retirement benefits was returned to the states. 10 U.S.C. § 1408(c)(1) provided:

> Subject to the limitations of this section, a court may treat disposable retired pay payable to a member for pay periods beginning after June 25, 1981, either as property solely of the member or as property of the member and his spouse in accordance with the law of the jurisdiction of such court.

The legislative history of the Act reveals the intention to remove the federal preemption and to permit state courts to apply state community property laws in determining whether military retired or retainer pay should be divisible upon divorce. S.Rep. No. 97–502 p. 16, *reprinted in* 1982 U.S.CODE CONG. & ADMIN.NEWS p. 1611. Benefits may be divided without regard to the length of the marriage. While there is no limitation on the number of years of marriage required for divisibility of the benefits, there is a ten

**19.** For an excellent discussion of USFSPA, *see* Marshal S. Willick, MILITARY RETIREMENT BENEFITS IN DIVORCE, American Bar Association (1998) and David R. McClure, *Retirement* *Benefits—Federal and Private,* STATE BAR OF TEXAS MARRIAGE DISSOLUTION INSTITUTE at X (1993).

year requirement before a former spouse is entitled to receive direct payment. 10 U.S.C. § 1408(d)(2); *Oxelgren v. Oxelgren*, 670 S.W.2d 411, 413 (Tex.App.—Fort Worth 1984, no writ).

### Gross v. Net Benefits

Once the issue concerning the ten-year requirement was resolved, the debate focused on whether state courts could apportion gross military retirement benefits received or to be received, or whether the courts were limited by 10 U.S.C. § 1408(c)(1) to divide only the disposable retired or retainer pay. In Texas, that dispute was settled by the Texas Supreme Court in *Grier v. Grier*, 731 S.W.2d 931 (Tex.1987), with the Court concluding that USFSPA did not limit the amount of retirement benefits that could be characterized or apportioned under Texas community property laws; the statutory provisions were intended only as a limit on the amount of disposable retired pay which could be garnished and subjected to direct payment. *Id.* at 933. When faced directly with the question, the United States Supreme Court disagreed. In *Mansell v. Mansell*, 490 U.S. 581, 109 S.Ct. 2023, 104 L.Ed.2d 675 (1989), the Court determined that while USFSPA authorized state courts to treat disposable retired pay as community property, it did not authorize the courts to treat total retired pay as community property. *Id.* at 589, 109 S.Ct. at 2029. In effect, the decision overruled *Grier*.

### Effect of Mansell on Res Judicata Principles

Once again, a debate ensued: What effect did *Mansell* have on prior Texas decrees? The Texas Supreme Court addressed this issue in *Berry v. Berry*, 780 S.W.2d 846 (Tex.App.—Dallas 1989), *rev'd*, 786 S.W.2d 672 (Tex.1990). The Berrys

were divorced in 1980 with Mr. Berry ordered to pay Mrs. Berry 25 percent of his gross Air Force disability retirement pay, which Mr. Berry had elected to receive in lieu of military retirement benefits. In 1987, Mr. Berry waived a portion of the disability pay in exchange for similar benefits from the Veterans Administration, reducing his gross pay from $2,422 per month to $1,067 per month.[20] He adjusted the payments to his former spouse accordingly. Mrs. Berry attempted to enforce the prior order, but the trial court overruled the motion. The court of appeals, relying upon *Mansell*, determined that USFSPA barred state courts from treating, as property divisible upon divorce, military retirement pay waived to receive Veterans Administration disability benefits. In reversing, the Supreme Court noted:

> The court of appeals apparently determined that retroactive application of USFSPA to a final divorce decree was required because *Mansell* permitted modification of a property settlement that had become final prior to the statute's enactment. The court of appeals failed to observe that the result in *Mansell* was based on a determination by the California Court of Appeals that it was appropriate, under California law, to reopen the final settlement order.... *Mansell* does not dictate a similar result under Texas law. The Supreme Court explicitly left the question of retroactive application of the USFSPA to state courts.

*Id.* at 673. The Court then applied the principle of *res judicata* to enforce the pre-USFSPA decree. *See also, Elliott v. Elliott*, 797 S.W.2d 388, 391 (Tex.App.—Austin 1990, no writ)(holding that neither USFSPA nor *Mansell* was retroactive in its effect as a general rule).

---

**20.** Military retirees may receive disability benefits only to the extent that they waive a corresponding amount of military retirement pay. However, because disability benefits are exempt from federal, state and local taxation, military retirees who waive retirement pay in favor of disability benefits increase their after-tax income. 10 U.S.C. §§ 3101(a), 3105; *Mansell*, 490 U.S. at 583–84, 109 S.Ct. at 2026.

*Direct Payment for Pre–*
*USFSPA Decrees*

Richard takes these general principles and argues that since USFSPA is not to be applied retroactively, the Act's provision for direct payment cannot be utilized to obtain direct payment of benefits awarded in a pre-USFSPA decree. We look first to the specific provisions of the Act. The enabling section provides in part:

> (b) Subsection (d) of section 1408 of title 10, United States Code, as added by section 1002(a), shall apply only with respect to payments of retired or retainer pay for periods beginning on or after the effective date of this title [February 1, 1983], but without regard to the date of any court order. *However, in the case of a court order that became final before June 26, 1981, payments under such subsection may only be made in accordance with such order as in effect on such date and without regard to any subsequent modifications.* [Emphasis supplied].

Section 1006 of Pub.L. 97–252, as amended Pub.L. 98–94, Title IX, § 941(c)(4), Sept. 24, 1983, 97 Stat. 654; Pub.L. 98–525, Title VI, § 645(b), Oct. 19, 1984, 98 Stat. 2549.

■ Richard argues that this language, as applied to the pre-*McCarty* Chandler decree, means that payments may only be made as provided for in the decree, i.e., that Richard will pay to Rachel her share of the benefits as he receives them. In other words, he contends that direct payment is an unauthorized modification. We disagree. Not only must we review the statutory language in USFSPA, we must also review the language found in the Code of Federal Regulations. USFSPA provided that the secretaries of the armed services shall prescribe uniform regulations for the administration of the Act. 10 U.S.C. § 1408(j). The regulations were implemented on January 18, 1985 and appear at 32 C.F.R. §§ 63.1–63.6. *See* 50 Fed.Reg. 2,667 (1985). They were amended once, following the 1986 amendments to USFSPA. *See* 52 Fed.Reg. 25,215 (1987). Pertinent to our analysis, § 63.1 establishes the purpose of the regulations: "Under 10 U.S.C. 1408, this part establishes policy and authorizes direct payments to a former spouse of a member from retired pay in response to court-ordered alimony, child support, or division of property." The procedures for obtaining direct payment are contained within § 63.6. Subsection (c)(7) provides:

> Court orders awarding a division of retired pay as property that were issued before June 26, 1981,[21] shall be honored if they otherwise satisfy the requirements and conditions specified in this part. A modification on or after June 26, 1981, of a court order that originally awarded a division of retired pay as property before June 26, 1981, may be honored for subsequent court-ordered changes made for clarification, such as the interpretation of a computation formula in the original court order. For court orders issued before June 26, 1981, subsequent amendments after that date to provide for a division of retired pay as property are unenforceable under this part. If the court order awarding a division of retired pay as property is issued on or after June 26, 1981, subsequent modifications of that court order shall be honored if they otherwise satisfy the requirements and conditions specified in this part.

32 C.F.R. § 63.6(c)(7).

■ Thus, the secretaries of the armed services have determined that if a pre-*McCarty* decree divided military retirement benefits, direct payment may be obtained. If that decree is modified for purposes of clarification, such as the interpretation of a computation formula, direct payment may be obtained for the clarification order. Direct payment is not available for a modification order of a pre-*McCarty* decree that did not divide military retirement benefits at the time of

---

**21.** We reiterate that the *McCarty* decision issued on June 26, 1981.

divorce. Direct payment is available for post-*McCarty* decrees and modifications if the order otherwise satisfies the requirements of the Act.[22]

The "modification" [23] language is significant and requires discussion. Congress amended USFSPA on November 5, 1990, altering 10 U.S.C. § 1408(c)(1) as follows:

A court may not treat retired pay as property in any proceeding to divide or partition any amount of retired pay of a member as the property of the member and the member's spouse or former spouse if a final decree of divorce, dissolution, annulment, or legal separation (including a court ordered, ratified, or approved property settlement incident to such decree) affecting the member and the member's spouse or former spouse (A) was issued before June 26, 1981, and (B) did not treat (or reserve jurisdiction to treat) any amount of retired pay of the member as property of the member and the member's former spouse.

As for the effective date of the amendment, the statute provided:

The amendment made by subsection (a) [amending subsection (c)(1) of section 1408] shall apply with respect to judgments issued before, on, or after the date of the enactment of this Act. In the case of a judgment issued before the date of the enactment of this Act, such amendment shall not relieve any obligation, otherwise valid, to make a payment that is due to be made before the end of the two-year period beginning on the date of the enactment of this Act.

Pub.L. No. 101–510, § 555(e), 104 Stat. 1569, 1570 (1990), amended by Pub.L. No. 102–190. § 1062(a)(1), 105 Stat. 1475 (1991). The reasons for this amendment are clear from the legislative history:

The committee is concerned because some state courts have been less than faithful in their adherence to the spirit of the law. The reopening of divorce cases finalized before the Supreme Court's decision in *McCarty v. McCarty* that did not divide retired pay continues to be a significant problem. Years after final divorce decrees have been issued, some state courts ... have reopened cases (through partition actions or otherwise) to award a share of retired pay. Although Congress has twice stated in report language that this result was not intended, the practice continues unabated. Such action is inconsistent with the notion that a final decree of divorce represents a final disposition of the marital estate.

H.R.Rep. No. 665, 101st Cong., 2d Sess. 279, *reprinted in* 1990 U.S.CODE CONG. & ADMIN. NEWS p. 3005.

The impact of the amendment spurred further debate and spawned additional litigation. The Trahans offer a perfect example. The Trahans were married in 1943 and divorced for the first time in 1963. They remarried in 1970 and were divorced again in 1971. Neither divorce decree referenced Mr. Trahan's military retirement benefits. In 1977, Mrs. Trahan filed a partition action and she was granted a portion of the benefits. While the case was on appeal, the *McCarty* opinion issued and the Texas Supreme Court ultimately

---

**22.** At least one commentator has suggested that direct payment is not permissible with regard to a post-June 26, 1981 partition order because a partition order does not fall within the definition of "court order" contained within 10 U.S.C. § 1408(a)(2). David R. McClure, *Retirement Benefits—Federal and Private,* STATE BAR OF TEXAS MARRIAGE DISSOLUTION INSTITUTE at X–35 (1993).

**23.** While the Family Code prohibits the post-judgment modification of a division of proper-

ty contained within a decree of divorce, post-divorce partition of undivided property is expressly authorized. Former TEX.FAM.CODE ANN. §§ 3.71(a)[now codified at § 9.007(a)]; 3.90 [now codified at § 9.201]; 3.91 [now codified at § 9.203]; 3.92 [now codified at § 9.204]. Under this statutory scheme, it is quite possible that the overall percentage distribution of the community estate effectuated at divorce will be substantially altered as a result of the partition.

reversed and rendered judgment in Mr. Trahan's favor. *Trahan v. Trahan,* 626 S.W.2d 485 (Tex.1981). In February 1983, after the passage of USFSPA, Mrs. Trahan filed another partition action; she was awarded 38.96 percent of Mr. Trahan's benefits. The case went up the appellate ladder once again, with the judgment affirmed. *Trahan v. Trahan,* 682 S.W.2d 332 (Tex.App.—Austin 1984, writ ref'd n.r.e.), *dism'd,* 475 U.S. 1002, 106 S.Ct. 1171, 89 L.Ed.2d 291 (1986). After passage of the 1990 amendment to USFSPA, Mr. Trahan filed suit for a declaratory judgment, contending that the amendment was intended to be retroactive and that it nullified the partition judgment. The trial court granted the relief requested. On appeal, Mrs. Trahan contended that the amendment to USFSPA did not preempt application of the common law doctrine of *res judicata.* The appellate court agreed, noting that her property right in the military retirement benefits vested when the partition judgment was affirmed in 1984; *res judicata* barred reopening the issue of whether she possessed a property interest. Because the subsequent amendment of USFSPA did not destroy her property right, the declaratory judgment was reversed. Both the Texas Supreme Court and the United States Supreme Court denied review. *Trahan v. Trahan,* 894 S.W.2d 113 (Tex.App.—Austin 1995, writ denied), *cert. denied,* 517 U.S. 1251, 116 S.Ct. 2515, 135 L.Ed.2d 203 (1996).

The impact of the amendment on the common law doctrine of tenancy-in-common is less clear. Under Texas law, upon entry of a final decree of divorce, the former spouses hold any undivided community property as tenants-in-common which is subject to partition in a post-divorce proceeding. *Busby v. Busby,* 457 S.W.2d 551, 554–55 (Tex.1970). One commentator has suggested that a pre-*McCarty* decree that fails to specifically mention military retirement benefits nevertheless "treats" a community interest in the benefits by converting it into tenancy-in-common property. William A. Reppy, Jr., *The*

*1990 U.S.F.S.P.A. Amendment: No Bar to Recognition of Tenancy in Common Interests Created by Pre–McCarty Divorces that Fail to Divide Military Retirement Benefits,* 29 IDAHO L.REV. 941, 948 (1992). One intermediate appellate court has agreed. *Walton v. Lee,* 888 S.W.2d 604, 605 (Tex.App.—Beaumont 1994, writ denied), *cert. denied,* 516 U.S. 870, 116 S.Ct. 190, 133 L.Ed.2d 127 (1995)(holding that under Texas law the courts automatically treat or reserve jurisdiction to treat retired pay by virtue of common law theories governing ownership of undivided property such that subsequent partition is not precluded by federal law). Directly contra is *Knowles v. Knowles,* 811 S.W.2d 709 (Tex.App.—Tyler 1991, no writ)(holding that because a 1972 divorce decree did not purport to divide the military retirement benefits, the 1990 amendment to USFSPA precludes a subsequent partition). The Texas Supreme Court has yet to address the issue. *Buys v. Buys,* 924 S.W.2d 369, 375 (Tex.1996)("[W]e do not consider and express no opinion on whether the 1990 amendment preempts a community property state court's ability to partition 'tenancy in common' military retirement benefits earned during marriage but not awarded in the final divorce decree."). Yet another court has concluded that where a 1988 agreed partition order divided military retirement benefits which were undivided in a pre-*McCarty* decree, the 1990 amendment to USFSPA would not preclude enforcement. *Ex parte Kruse,* 911 S.W.2d 839, 841 (Tex.App.—Amarillo 1995, orig. proceeding)("Even though the amended USFSPA has retroactive application to preempt state community property law in those situations to which it applies, that is far different from the question whether USFSPA preempts the common law doctrine of res judicata.").

Accordingly, we conclude that direct payment to Rachel of her interest in Richard's military retirement benefits, as requested by her and as granted by USAFAC, is not an unauthorized modification

of the decree and does not violate USFS-PA. Points of Error Five, Six, and Ten are overruled.

## THE PERMANENT INJUNCTION

In Points of Error Seven, Eight, and Nine, Richard challenges the trial court's entry of an order which permanently enjoins him from:

- Filing any new actions against or proceeding with any actions pending against Rachel, William Copeland, Weldon S. Copeland, Sr., Weldon S. Copeland, Jr., Walter Boyaki, John Mundie, Ralph Miranda, and the United States of America, including the United States Army, the United States Treasury, and all other Agencies, Branches, or Component Parts of the United States Government;

- Representing or contending to any public officials in any form or forum that the Decree of Divorce rendered by the Court on May 28, 1980 in cause no. 77–1540 is null or void or invalid or is otherwise not a valid final judgment;

- Representing or contending to any public officials in any form that his marriage to Rachel was null or void or invalid or otherwise not lawful or legal; and

- Representing or contending to any public officials in any form or forum that the Order Granting Partial Motion for Summary Judgment filed in Cause No. 87–5225 is a valid final judgment.

Richard contends that the injunction violates TEX.R.CIV.P. 683, and is constitutionally impermissible because it denies him liberty, free speech, and property without due process of law. He further complains that TEX.R.CIV.P. 329b is unconstitutional. Lastly, he argues that he was denied a jury trial.

## TEX.R.CIV.P. 683

■ Pursuant to TEX.R.CIV.P. 683, an injunction shall set forth the reasons for the issuance, shall be specific in its terms, and shall describe in reasonable detail the acts enjoined. The injunction here specifically states that it is issued because:

RICHARD CHANDLER's action herein is groundless, frivolous, brought in bad faith, and brought for the sole purpose of harassment, that RICHARD CHANDLER has filed multiple actions in this and other courts seeking to invalidate and nullify this Court's Decree of Divorce of May 28, 1980, and this Court's Judgment of May 6, 1991, that all such actions are groundless, frivolous, brought in bad faith, and brought for the sole purpose of harassment, that all issues which RICHARD CHANDLER seeks to litigate in such actions have been previously resolved against RICHARD CHANDLER by the existing lawful Decree and Judgment of this Court, that such actions are barred by limitations and res judicata, that such actions address a threat to the jurisdiction of this Court, that the harm to Defendants constitutes irreparable harm, that the entry of a permanent injunction and a permanent Order to Cease and Desist is necessitated to protect Defendants from vexatious and harassing litigation.

A prerequisite for injunctive relief is the threat of imminent harm. *Operation Rescue–National v. Planned Parenthood of Houston and Southeast Texas, Inc.,* 975 S.W.2d 546, 554 (Tex.1998). The repetitious lawsuits brought over many years in many venues, all raising the same issues which had been resolved against him, demonstrate a proven track record of an abuse of the litigation process. The imminent harm to the defendants was clear—the ongoing expense of time and money to defend themselves in state and federal courts across the State of Texas.

Further, the terms of the injunction and the acts enjoined are specific. As we have detailed, the order enjoins Richard from filing suit against certain named parties and/or entities and from making specific contentions to specific parties and/or entities. We find that the order complies with the requirements of Rule 683. *Schleuter*

*v. City of Fort Worth,* 947 S.W.2d 920, 933 (Tex.App.—Fort Worth 1997, writ denied).

### Injunction Against Filing Further Suits on the Subject Matter

■ An anti-suit injunction is appropriate in four instances:

• to address a threat to the court's jurisdiction;

• to prevent the evasion of important public policy;

• to prevent a multiplicity of suits; or

• to protect a party from vexatious or harassing litigation.

■ *Golden Rule Ins. Co. v. Harper,* 925 S.W.2d 649, 651 (Tex.1996); *Gannon v. Payne,* 706 S.W.2d 304, 307 (Tex. 1986). The party seeking the injunction must show that "a clear equity demands" the injunction. *Golden Rule Ins. Co.,* 925 S.W.2d at 651; *Christensen v. Integrity Ins. Co.,* 719 S.W.2d 161, 163 (Tex.1986). Delay and expense of litigation are factors which may be considered in determining whether an injunction should issue. *In re Estate of Dilasky,* 972 S.W.2d 763, 767 (Tex.App.—Corpus Christi 1998, no pet.).

■ This case falls squarely within the third and fourth criteria. In each of the lawsuits filed by Richard, he has attempted to relitigate whether his marriage to Rachel was void and whether Rachel is entitled to an interest in his military retirement benefits. These issues have been resolved against him. His continuous barrage of law suits against his former wife and virtually every attorney that has come into contact with this case is vexatious and meant to harass. We find no abuse of discretion in enjoining these acts.

### Free Speech

Richard next argues that his constitutional right to free speech is violated by enjoining him from presenting the partial summary judgment to any public official. He addresses his argument only to the Texas Constitution. Because he does not urge a violation of the First Amendment of the United States Constitution, we do not address it. We recognize, however, that although two opinions[24] of the Texas Supreme Court have concluded that Article I, Section 8 of the Texas Constitution affords broader protection of speech than the First Amendment, the Court has more recently determined that "[w]e know of nothing to suggest that injunctions restricting speech should be judged by a different standard under the state constitution than the First Amendment." *Operation Rescue–National,* 975 S.W.2d at 558.

Article I, section 8 of the Texas Constitution states in pertinent part:

Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press.

This provision in our state Bill of Rights, like the First Amendment to the United States Constitution and similar provisions in the constitutions of other states, enshrines and protects a fundamental right long treasured by the people of this nation, the right of free speech. *Davenport v. Garcia,* 834 S.W.2d 4, 30 (Tex.1992). That right, however, is not absolute, as we long ago learned in our thinking about the First Amendment. *Id.* Justice Holmes' classic example, familiar to lawyers and non-lawyers alike, is that one does not have the right of "falsely shouting fire in a theatre and causing a panic." *Id. citing Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919). Free speech can be abused, as Article I, Section 8 expressly recognizes, and responsibility for that abuse is not only consistent with protecting the freedom, it is part of the freedom itself. *Davenport,* 834 S.W.2d at

---

**24.** *See Davenport v. Garcia,* 834 S.W.2d 4 (Tex.1992) and *Ex parte Tucci,* 859 S.W.2d 1

(Tex.1993).

30. Freedom and responsibility have a symbiotic relationship; they are part of one another, yet operate in tension. *Davenport*, 834 S.W.2d at 30.

■ Directing us to *Ex parte Tucci*, 859 S.W.2d 1 (Tex.1993), Richard urges that restraints of free speech may be imposed only if the injunctive relief granted encompasses the least restrictive means of protecting against the harmful effect. The Supreme Court has since acknowledged that it misunderstood in *Tucci* the First Amendment test for injunction restrictions on speech. *Operation Rescue–National*, 975 S.W.2d at 558. Instead, the appropriate constitutional standard is that an injunction must burden no more speech than necessary to serve a significant government interest. *Id.* at 560.

■ The trial court has enjoined Richard from representing to any public officials that the final decree of divorce is null, void, or invalid; that his marriage to Rachel was null, void, or invalid; or that the partial summary judgment in the bill of review is a valid final judgment. This was done to prevent Richard from attempting to strip Rachel of her vested property interest in his military retirement benefits. This limited burden on his speech is designed to ensure recognition and respect for our traditional concepts of *res judicata*, to protect targets of vexatious litigation from endless expense, and to protect the courts from an intrusion into already crowded dockets and strained resources. On the record before us, the injunction was reasonably tailored to the peculiar circumstances presented. *Operation Rescue–National*, 975 S.W.2d at 560 ("[A] trial court has some latitude in fashioning the details of appropriate relief."). We find no abuse of discretion in the trial court's determination that Richard should be enjoined from representing that Rachel is not entitled to her vested property interest in the military retirement benefits.

## TEX.R.CIV.P. 329b

■ Referencing TEX. CONST. art. I, § 13 (open courts provisions) and the Fourteenth Amendment of the United States Constitution, Richard alleges that the manner in which Rule 329b was applied *in the bill of review action* was unconstitutional. We quote him here:

> Under *Baker*[25] Richard was required to plead and prove (1) a meritorious defense to the cause of action, (2) which he was prevented from asserting by the fraud, accident, or wrongful act of the opposing party, (3) unmixed with any fault or negligence of his own.... Although the marriage was void, Rule 329b(f) and *Baker* unconstitutionally required Richard to prove that he was prevented from presenting the defense of the void marriage in the divorce action because of Rachel's fraud.

Without regard to the merits of his contentions, we are unable to address them. Although Richard appealed the take-nothing judgment in the bill of review action, he did not challenge the constitutionality of those proceedings or the application of Rule 329b. Accordingly, he has waived his constitutional complaints.

### *Jury Trial*

■ Richard asserts that he received notice of the injunction hearing on February 28, 1997, for a trial setting of March 14, 1997. He alleges that he filed a jury demand on March 11, 1997.[26] He contends

---

25. *Baker v. Goldsmith*, 582 S.W.2d 404 (Tex. 1979).

26. The clerk's record is composed of an original volume and six supplements. Each contains a bill of costs. The bill of costs contained in volume one is dated November 8, 1995. While it duly reflects that a jury fee has been paid, this cannot be the fee that Richard references, which he claims was paid in March of 1997. Clearly, this jury fee relates to the jury trial in the bill of review action. The remaining volumes each contain a bill of costs, dated September 11, 1997, September 18, 1997, November 17, 1997, February 9, 1998, March 4, 1998, and March 31, 1998. None of these documents reflect the payment of a jury fee. While the record

that the trial court erred in denying his right to a jury trial since he had insufficient notice of the setting to timely file his request.

The Texas and United States Constitutions guarantee a jury trial. TEX.CONST. art. I, § 15; U.S. CONST. art. III, § 2. To be entitled to a jury trial, a party must follow the procedure set out in TEX. R.CIV.P. 216: not less than thirty days before trial, the party must make a written request for a jury and pay a jury fee. *Huddle v. Huddle*, 696 S.W.2d 895, 895 (Tex.1985); *Higginbotham v. Collateral Protection, Inc.*, 859 S.W.2d 487, 489 (Tex. App.—Houston [1st Dist.] 1993, writ denied).

Our review of the record does not substantiate compliance with Rule 216; it fails to establish that a request was filed with the court or that the jury fee was paid. Richard testified at the March 14, 1997 hearing that he had requested a trial by jury, although it was admittedly not timely.[27] However, he did not apprise the court at the beginning of the hearing that he sought a jury trial. It was not until the conclusion of the hearing, after Rachel's attorney had rested, that Richard raised the issue. Had he brought it to the court's attention at the beginning of the hearing, and had he requested a continuance so that his jury demand would be timely filed,

he would be entitled to relief. Having failed to do so, he has waived error. *Higginbotham*, 859 S.W.2d at 489. Thus, even if the record supported his contention that the jury demand was filed and the fee paid, we would still be constrained to find waiver. Points of Error Seven, Eight, and Nine are overruled.

## ATTORNEYS' FEES

■ The final order provided that Rachel and Weldon S. Copeland, Jr. recover attorneys' fees in the amount of $7,500 for presentation of the case in the trial court, $4,500 in the event of an appeal to the court of appeals, and $4,500 in the event of an appeal to the Supreme Court. Although not delineated in a separate point of error, Richard complains that a material fact issue exists regarding the award of attorneys' fees and that Rachel and her attorneys "have not submitted any summary judgment proof that would support the award of attorney fees." Rachel would have been entitled to seek attorneys' fees with regard to both Richard's suit to declare marriage void[28] and his motion to clarify.[29] Because Richard also sought relief under the Uniform Declaratory Judgments Act, Rachel would have been entitled to seek attorneys' fees on that basis as well. TEX.CIV.PRAC. & REM.CODE ANN. § 37.009 (Vernon 1997). However, while her motion for summary judgment specifi-

---

reflects that Richard's response to the motion for injunction and cease and desist order contained a statement that he had filed a jury demand and paid the fee, and although his designation of the transcript requests inclusion of the jury demand, it does not appear anywhere in the record. What is included is the portion of the docket sheet which indicates the response to the injunction request was filed on March 11, 1997. There is no entry indicating that a jury demand was filed or that the jury fee was paid.

**27.** Richard did not testify that he had paid the jury fee.

**28.** Former TEX.FAM.CODE ANN. § 3.65 (Vernon 1993)("In a suit for divorce or annulment or to declare a marriage void, the court may award costs to any party as it deems reason-

able."). Attorney's fees may appropriately be assessed as costs. *Hirczy v. Hirczy*, 838 S.W.2d 783, 786 (Tex.App.—Corpus Christi 1992, writ denied); *MacCallum v. MacCallum*, 801 S.W.2d 579, 587 (Tex.App.—Corpus Christi 1990, writ denied). Title 1 of the Family Code was recodified by Acts 1997, 75th Leg., R.S., ch. 7, § 1, 1997 TEX.GEN.LAWS 8, eff. April 17, 1997. Specifically, former § 3.65 has been recodified and amended as § 6.708(a). *Id.* at 33. Because this proceeding was commenced prior to the recodification, we refer to the former statutory provisions.

**29.** Former TEX.FAM.CODE ANN. § 3.77(Vernon 1993)("Reasonable attorney's fees may be taxed as costs in any proceeding under this subchapter...."). Former § 3.77 has been recodified as § 9.014.

cally sought the recovery of attorneys' fees, she failed to attach an affidavit of counsel as expert opinion testimony on the reasonableness of the fees. *Giao v. Smith & Lamm, P.C.*, 714 S.W.2d 144, 148 (Tex. App.—Houston [1st Dist.] 1986, no writ); Judge David Hittner & Lynne Liberato, *Summary Judgments in Texas*, 34 HOUS. L.REV. 5, 1377 (1998). Oral testimony is not to be received at the hearing. TEX. R.CIV.P. 166a(c); *Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 269 n. 4 (Tex. 1992). That being the case, the imposition of attorneys' fees in the summary judgment proceedings was inappropriate.

■ Remaining, then, is the propriety of the fee award on the basis of the injunction and cease and desist order. In his brief, Richard complains that the testimony of Weldon S. Copeland, Jr. was self-serving, that as a sitting judge[30] he could not be awarded attorney's fees for representing Rachel, that Judge Marsh "rubber stamped" the amount of fees, and that for attorneys' fees to be recoverable, a party must actually recover damages. Without regard to the merits of these arguments, we conclude Richard has waived error, if any, for failure to present the issue to the trial court.[31] TEX.R.APP.P. 33.1(a). The only remaining challenge to the fee award

is, in effect, a complaint that the evidence is insufficient. Richard does not label it as such, address the appropriate standards of review, or brief the issue. His argument, in its entirety, is that:

> At page 42 of SOF3, Judge Copeland indicates that his testimony refers to No. 77–540 and No. 87–5225 and the number of work hours involved was 30 hours at $150 an hour. Judges Copeland and Marsh compute a reasonable attorneys [sic] fee at $7,500. Richard multiplies 30 hours times $150 and computes $4,500. Likewise, attorney fees on appeal suffer from the same error; 25 hours at $150 is $3,750 not $4,500 and 30 hours at $150 is $4,500 not $7,500.

The fee testimony at trial, while not extensive, was a bit more detailed. Weldon S. Copeland, Jr. testified that with regard to Cause No. 77–1540, no less than thirty hours had been spent in trial preparation at an hourly rate of $150. He then determined that preparation of the case to the court of appeals would require no "less than 30 hours on the case, more like 50." He projected that fees for the appeal to the intermediate court would range between $4,500 [representing thirty hours at $150 per hour] and $7,500 [representing fifty hours at $150 per hour]. He antici-

---

**30.** Weldon S. Copeland, Jr. withdrew as Rachel's attorney of record in 1989, left the practice of law, and became the judge of the County Court at Law of Collin County.

**31.** In his motion for new trial, Richard's only complaint addressing the fee award was as follows:

> The court erred in awarding attorney's fees to defendant attorneys and other, not a party to this suit, because there is no basis for attorney fees in this case which arises from the divorce action Cause No. 77–1540, because such judgment if void, and if not void, did not award attorney's fees. Cause No. 87–5225 is a continuation of Cause No. 77–1540 and the partial summary judgment rendered in Cause No. 87–5225 on May 25, 1990, denied Rachel Chandler attorney's fees and the judgment rendered in Cause No. 87–5225 on May 6, 1991, on a jury verdict, specifically denied Rachel Chandler any attorney's fees.

We pause to note that Weldon S. Copeland, Jr. withdrew as the attorney of record for Rachel prior to the entry of judgment in the bill of review proceedings. That judgment specifically denied Rachel any recovery for attorneys' fees. The proceedings in issue in this appeal were not commenced until 1994, some five years after Rachel substituted William Copeland as her attorney of record. However, Weldon S. Copeland, Jr. was a named defendant in this litigation, and sought and received summary judgment on those claims. He did not seek injunctive relief in his individual capacity, nor did Rachel request attorneys' fees in connection with her request for injunctive relief. Richard has not complained of these discrepancies on appeal. A court of appeals may not reverse or reform a trial court's judgment except upon properly assigned error. *Pat Baker Co., Inc. v. Wilson*, 971 S.W.2d 447, 450 (Tex.1998), *Allright, Inc. v. Pearson*, 735 S.W.2d 240, 240 (Tex.1987).

pated a like amount would be required for presentation of the case to the Texas Supreme Court.

Copeland also testified to fees incurred in connection with Cause No. 87–5225, estimating that between thirty and fifty hours had been spent on that matter as well. Once again, he projected an appeal to the intermediate court would generate fees of $7,500 and fees of $4,500 in preparing the matter for the Supreme Court. Thus, the testimony as to representation in both causes reflects total hours of 60 to 100 at the rate of $150 per hour, presenting a range of fees for trial presentation between $9,000 and $15,000. This evidence more than supports the $7,500 award.

■ As for appeals to the intermediate court, Copeland's testimony provides a range between $12,000 [representing $4,500 for Cause No. 77–1540 and $7,500 for Cause No. 87–5225] to $15,000 [representing $7,500 for each cause]. For presentation to the Supreme Court, the total range of testimony references $9,000 [representing $4,500 for Cause No. 77–1540 and $4,500 for Cause No. 87–5225] to $12,000 [representing $7,500 for Cause No. 77–1540 and $4,500 for Cause No. 87–5225]. Certainly these two causes are irretrievably tangled and intertwined with the same or similar issues presented. The court accepted the high-end testimony for one cause as the reasonable fee for presentation at the trial court level, and the low-end testimony for one cause as the reasonable fee for presentation to the court of appeals and the Supreme Court. We conclude that the fee award is supported by sufficient evidence.

32. We note that Weldon S. Copeland, Sr. was included among the parties protected by the cease and desist order. Because Richard has not challenged the cease and desist order on that basis, we do not address the issue.

33. In their book, SECOND CHANCES, Judith Wallerstein and Sandra Blakeslee recount three stages of divorce. The first or acute stage begins with escalating unhappiness and crests with the decision to divorce, setting the stage

## IMPROPER PARTY

Once again, although not designated as a point of error, Richard complains that the summary judgment is improper because there is a material fact issue precluding summary judgment for Weldon S. Copeland, Sr. In his brief, he states:

Richard asserts that a material fact issue exists regarding Weldon S. Copeland being a party to this case. The docket in this cause only shows that Rachel, William and Weldon, Jr. have been served and shows that only they have answered. The existence of such material fact issue precludes summary judgment for Weldon S. Copeland.

While the motion for summary judgment filed by Rachel alleges that "RACHEL CHANDLER, WILLIAM COPELAND, WELDON S. COPELAND, AND WELDON S. COPELAND, JR., are entitled to judgment in their favor as a matter of law," the final judgment at bar does not grant summary judgment in favor of Weldon S. Copeland.[32] We find this argument to be without merit.

## CONCLUSION

We recognize that divorce litigation is fraught with emotion, anger, hostility, and bitterness. The unraveling of the fabric we call "family" necessitates a period of grieving the death of the relationship. In her renowned book, ON DEATH AND DYING, Dr. Elisabeth Kubler–Ross recounts the five stages an individual endures in assimilating the death of a loved one: denial, anger, bargaining, depression, and finally, acceptance. Divorcing spouses encounter similar stages.[33] As with all modern trag-

"for the spilling of anger and sexual impulses, depression and disorganization in the family." The second or transitional stage "is a time of alternating progress and regression, a time of trial and error and fluctuating moods." They describe the third stage as "marked by a renewed sense of stability." Judith Wallerstein & Sandra Blakeslee, SECOND CHANCES: MEN, WOMEN & CHILDREN A DECADE AFTER DIVORCE. WHO WINS, WHO LOSES, AND WHY, pp. 8–10 (1989).

edies, there comes a time when closure is necessary.

We find some similarity between the circumstances of this case and *Goad v. Goad,* 768 S.W.2d 356 (Tex.App.—Texarkana 1989, writ denied), *cert. denied,* 493 U.S. 1021, 110 S.Ct. 722, 107 L.Ed.2d 742 (1990). The dispute between the Goads involved Mrs. Goad's receipt upon divorce of an interest in Mr. Goad's military retirement benefits. The court of appeals ultimately sanctioned Mr. Goad, recognizing that "[t]he fact that this is the sixth proceeding on this subject matter, not including the original decree that made the property division, convinces us that Roland Goad is intent upon continuing litigation against his ex-spouse despite judicial rulings." *Id.* at 360. When repetitious, vexatious, and harassing lawsuits are the chosen response to unsuccessful litigation, the courts must step in. For the Chandlers, closure comes only through injunctive relief.

We overrule all ten points of error and affirm the judgment below.